Emilio GARCIA, Plaintiff-Appellant,

v.

UNITED STATES of America, et al.,
Defendants-Appellees.

No. 80–5473.

United States Court of Appeals,
Fifth Circuit.*
Unit B

Feb. 4, 1982.

* Former Fifth Circuit case, Section 9(1) of Public . Law 96–452—October 14, 1980.

William P. Cagney, III, Miami, Fla., for plaintiff-appellant.

William Kanter, Atty., Susan A. Ehrlich, Barbara L. Herwig, C. Frederick Geilfuss, Civ. Div., U. S. Dept. of Justice, Washington, D. C., for defendants-appellees.

Before RONEY, KRAVITCH and ANDERSON, Circuit Judges.

RONEY, Circuit Judge:

Plaintiff, Emilio Garcia, a drug informer, was given protection under the United States Marshal's Witness Protection Program, established by the Organized Crime Control Act of 1970. Discharged from the Program after giving newspaper interviews, he sued the United States and individual members of the Marshals Service for damages in a *Bivens* action, asserting the removal of protection had violated several of his constitutional rights. We affirm the

dismissal of his complaint against the individuals of the Marshals Service on the ground that, because of the nature and purpose of the Witness Protection Program, his discharge did not violate substantive or procedural due process, First Amendment or privacy rights, and did not constitute cruel and unusual punishment. Sovereign immunity supports the dismissal of the claim against the United States.

From 1970 to 1974 plaintiff worked for the Bureau of Narcotics and Dangerous Drugs and its successor, the Drug Enforcement Agency ("DEA"), as a "special employee." He infiltrated drug smuggling operations, collected information on their activities, reported this information to DEA officials, and testified in several major drug cases. In return for his cooperation and in consideration of the personal and potential danger to plaintiff and his family, the officials of the United States Marshals Service offered plaintiff the protection of the Witness Protection Program, which was established as Title V of the Organized Crime Control Act of 1970. Pub.L.No. 91–452, 84 Stat. 933–934, *reprinted in* 18 U.S.C.A. prec. § 3481 (Supp.1981). Plaintiff voluntarily accepted the offer and became a participant in the Program.

Discussions with plaintiff concerning the Witness Protection Program and its problems appeared in newspaper articles on May 12 and 14, 1975. Several more articles followed over the next four months. In these articles plaintiff revealed his presence in Miami and his identity as Emilio Garcia. In fact, the paper published plaintiff's picture. After this occurred, plaintiff was discharged from the Program. He was readmitted and discharged from the Program three times thereafter. Plaintiff asserts several of his constitutional rights were violated when he was removed from the Program in spite of the Government's obligation to him and with knowledge of threats to his life and danger to his family. Specifically, plaintiff alleges the termination was in violation of his Fifth Amendment procedural and substantive due process rights; in violation of the exercise of his First Amendment rights; in violation of his right to privacy from Government invasion; and in violation of his Eighth Amendment right to be free from cruel and inhuman punishment.

■ The question on this appeal is whether the complaint alleging a *Bivens* type action was properly dismissed by the district court. In *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court upheld a cause of action for damages against a federal official responsible for injury to a constitutionally protected interest. In order to sustain a *Bivens* type action, the plaintiff must first demonstrate that his constitutional rights have been violated. *Davis v. Passman*, 442 U.S. 228, 248, 99 S.Ct. 2264, 2278, 60 L.Ed.2d 846 (1979). We must, therefore, examine the Witness Protection Program and plaintiff's allegations and determine to what extent his constitutional rights were involved and whether they were violated by his discharge.

## Witness Protection Program

The Witness Protection Program is essentially an authorization for the Government to extend benefits in the form of protective facilities and other protection. The statute creating the Program provides that the Attorney General is authorized to procure protected facilities and otherwise offer to provide for the health, safety and welfare of witnesses against organized crime "whenever, in his judgment, testimony from, or a willingness to testify by, such a witness would place his life or person, or the life or person of a member of his family or household, in jeopardy." Pub.L.No. 91–452, 84 Stat. 933. Any person availing himself of an offer by the Attorney General to use such facilities may continue to use such facilities for as long as the Attorney General determines the jeopardy to his life or person continues. This provision gives the Attorney General broad authority to determine the particular facilities to be afforded and the length of time the facilities should be available. One cannot receive protection simply on demand.

The statute was enacted in response to a felt moral obligation to repay citizens who risk life by carrying out their duty as citizens to testify. It merely authorizes the provision of protection at the discretion of the Attorney General. The Attorney General has delegated his power over the Program to the United States Marshals Service. 28 C.F.R. § 0.111(c) (1980).

At present, the Marshals Service admits unincarcerated witnesses into the Program only after execution of "Memoranda of Understanding." Once a witness signs a Memorandum of Understanding, the Marshals Service assumes responsibility for his physical safety. The Service may either assign Marshals to guard the witness or give the witness a new identity and relocate him to another part of the country. If the witness is relocated, the Marshals may provide him with subsistence payments.

At the time plaintiff accepted protection under the Program, he and the Marshals Service entered into an oral agreement setting forth the conditions of his participation. The Marshals Service explicitly conditioned its offer of protection on plaintiff's "staying away from criminals, people that knew him and staying out of trouble." This restriction was imposed to ensure plaintiff's protection by his staying out of the public eye and away from those who threaten him. By allowing his picture, name and whereabouts to appear in the paper, his actions exposed him to those from whom the Marshals Service was attempting to protect him. Plaintiff admitted he was aware of the conditions of his continuance in the Program at the time of his actions.

### Due Process Claims

Plaintiff claims he has a right to protection under the Program. His termination from the Program without just cause and without prior notice and a hearing, he argues, violates his substantive and procedural due process rights.

The Witness Protection Program is essentially an authorization for the Government to extend benefits in the form of protective facilities and other protection. It does not create a right to protection. If the Attorney General does not provide protective facilities, the witness is still protected to the same extent as other Americans called as witnesses.

Although plaintiff may be eligible to receive or to continue to receive the benefits of the Program, his participation in the Program is not constitutionally mandated. *Cf. Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980); *Richardson v. Belcher*, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971). The Constitution does not require the establishment of the Witness Protection Program. In establishing a program to provide protection for witnesses against organized crime, Congress chose to grant to the Attorney General broad authority and discretion. With organized crime's feared disruption of the judicial system and the need of quick decisions without many people being involved, the Program bears a reasonable relation to the congressional purpose. *See generally United States v. Coastal States Crude Gathering Co.*, 643 F.2d 1125, 1127–28 (5th Cir. 1981).

■ The Marshals Service discharged plaintiff from the Program after he had endangered himself by revealing his identity and location publicly. The Service's actions were not arbitrary and were based on sufficient cause when plaintiff's own actions rendered the Program's protection ineffective. Plaintiff's substantive due process rights are not involved in this case.

■ Plaintiff's procedural due process claim is that he was terminated without notice and an opportunity to be heard. To establish such a claim, a plaintiff must show he has been deprived of a protected liberty or property interest encompassed in the Due Process Clause of the Fifth Amendment. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972).

■ A property interest is an entitlement to a Government benefit arising out of law or contract. It is not created by the Constitution. *Roth*, 408 U.S. at 577, 92 S.Ct. at

2709. The statute and legislative history repeatedly speaks of the legislation as "authorizing" the Attorney General to provide protection; it does not refer to a witness' entitlement to such protection. *See, e.g.*, H.R.Rep.No.91–1549, 91st Cong., 2d Sess., *reprinted in* [1970] U.S.Code Cong. & Ad. News 4007, 4008, 4024. The history reveals that the Program gives "broad authority" to the Attorney General over substantive decisions.

■ Plaintiff points to the last sentence of section 502 which provides that one "availing himself of an offer to use such facilities may continue to use such facilities for so long as the Attorney General determines the jeopardy to his life or person continues." Pub.L.No. 91–452, 84 Stat. 933. This language, plaintiff asserts, creates an entitlement to continued protection. This provision was not intended to limit the discretion of the Attorney General. Rather, the phrase was intended to ensure that protection extended beyond the time of trial. S.Rep.No.91–617, 91st Cong., 1st Sess. 58–59; 116 Cong.Rec.H. 35292 (Oct. 7, 1970) (comments of Rep. Poff). Nor was it intended to create a standard for judicial review. On the whole, the statutory scheme indicates that the Attorney General has discretion on an ongoing basis to decide when, to whom, and for how long to provide protective facilities.

■■ The liberty protected by the Due Process Clause affords protection against unwarranted Government interference with freedom of choice in the context of certain personal decisions. It does not confer an entitlement to protection. *See Harris v. McRae*, 448 U.S. 297, 317–18, 100 S.Ct. 2671, 2688–89, 65 L.Ed.2d 784 (1980). Here, plaintiff was not obligated to participate in the Program. It was a voluntary decision. Further, plaintiff was removed from a Government program which vested in the Attorney General the authority to determine who would be offered protection and the length of time protection under the program would be extended. The statute does not confer on participants the right to determine how long participation will last.

Plaintiff's removal, therefore, does not amount to an unwarranted Government interference on his freedom of choice.

There is no statutory or contractual entitlement to continued participation in the Program. There is not any cognizable liberty interest involved in plaintiff's claim. Therefore, there is no requirement for notice or a hearing.

### First Amendment Rights

Plaintiff contends that defendants discharged him from the Program in retaliation for exercising his First Amendment rights when he complained of the Program's problems in newspaper articles.

The Supreme Court has held that, in the context of certain relationships with the Government, the contours of an individual's First Amendment rights are affected by the situation. *See Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (students' First Amendment rights limited by school environment); *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (employment relationship affects contours of exercise of free speech). In *Pickering*, the Supreme Court recognized the need to arrive at a balance in the employment context between the interests of the Government employee as a citizen in commenting on public issues and the interest of the state in promoting the efficiency of its public services. *Id.* at 568, 88 S.Ct. at 1734.

The relationship in the present case also depends upon a balancing of interests. The plaintiff was voluntarily receiving protection from a Government program. The effectiveness and efficiency of that program is affected by the conduct of its individual participants. The Program's purpose is to provide protection. Anonymity is a key to its success. The purpose is defeated if those receiving protection speak in a way which make their identities and locations known thereby rendering the offered protection ineffective.

Plaintiff's interest in calling attention to perceived problems with the Program was substantial. Plaintiff's life was directly affected by the Program's operation. Still plaintiff could have criticized the Program without identifying himself and his location publicly. His actions increased the risk of danger to himself and his family and required increased protection for himself and his family, making additional demands on the Program's resources.

The Government did not violate the First Amendment when it terminated plaintiff from the Program. Plaintiff had materially and substantially interfered with the purpose and efficiency of this public service, and this interference outweighed the "public interest in having free and unhindered debate on matters of public importance." *Pickering*, 391 U.S. at 573, 88 S.Ct. at 1737; *Porter v. Califano*, 592 F.2d 770, 773 (5th Cir. 1979).

### Privacy Rights

Plaintiff contends that the withdrawal of protection without any justifiable basis exposed him to the criminal element and was an unwarranted invasion of his constitutional right to privacy.

The "right to privacy" is not found in any specific guarantee of the Constitution. Instead, the Court has recognized that "zones of privacy" may be created by certain specific constitutional guarantees or fundamental rights. *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). These fundamental rights include "matters relating to marriage, procreation, contraception, family relationships, child rearing and education." *Id.* at 713, 96 S.Ct. at 1166. The right to privacy restricts the Government's power to regulate or intrude on activity involving fundamental rights. *See, e.g., Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

Plaintiff's privacy claim fails for two reasons. First, plaintiff complains about his discharge. By removing plaintiff from the Program, the Government was not restricting his activity. Since the privacy right limits governmental restrictions and intrusions, it is not applicable in this instance. Second, plaintiff's right to participate in the Program is not a constitutional or fundamental right entitled to privacy protection.

### Cruel and Inhuman Punishment

Plaintiff further argues that his right to be free from cruel and inhuman punishment was violated by defendants' callous discharge of plaintiff. The facts of this case simply cannot support this Eighth Amendment claim.

In *Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), the Supreme Court examined the cruel and unusual punishment clause of the Eighth Amendment. In finding the constitutional prohibition against cruel and unusual punishment inapplicable in school paddlings, the Court held that this provision of the Eighth Amendment was designed to protect those convicted of crimes. *Id.* at 664, 97 S.Ct. at 1408. Here, plaintiff was not convicted of a crime. His discharge from the Program was a civil matter. It does not implicate Eighth Amendment protections.

### Bivens Action

Plaintiff contends that a *Bivens* action may only be defeated in two situations. The first is when defendants demonstrate "special factors counselling hesitation in the absence of affirmative action by Congress." *Bivens*, 403 U.S. at 396, 91 S.Ct. at 2004; *Davis v. Passman*, 442 U.S. at 245, 99 S.Ct. at 2276. The second is when defendants show that Congress has provided an equally effective alternative remedy which it explicitly declared to be a substitute for recovery directly under the Constitution. *See Bivens*, 403 U.S. at 397, 91 S.Ct. at 2005; *Davis v. Passman*, 442 U.S. at 245–47, 99 S.Ct. at 2276–78. Neither of these situations is present here according to the plaintiff.

Concededly, these two defenses are available to defeat a *Bivens* action when a valid *Bivens* claim is found to exist. Plaintiff, however, must first establish a violation of a valid constitutional claim. As our examination of plaintiff's alleged constitutional violations indicates, plaintiff failed to do so in this case.

### U. S. Immunity

In addition to suing the individual marshals, plaintiff sues the United States Government in this *Bivens* action. Plaintiff reads Title V of the Organized Crime Control Act to bar the Attorney General from expelling witnesses from the Program unless he first determines they are no longer in danger. Plaintiff, however, has not satisfied the jurisdictional prerequisites for suit against the Government.

An individual cannot sue the United States without its consent. *Doe v. Civiletti,* 635 F.2d 88, 93 (2d Cir. 1980). "[I]t has been said, ... that a waiver of the traditional sovereign immunity 'cannot be implied but must be unequivocally expressed.'" *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976), *quoting United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969); *Soriano v. United States,* 352 U.S. 270, 276, 77 S.Ct. 269, 273, 1 L.Ed.2d 306 (1957).

The complaint alleges jurisdiction under 28 U.S.C.A. § 1331 and looks directly to the Constitution for its substantive basis. This Court and others have held that 28 U.S.C.A. § 1331 is not a waiver of sovereign immunity. *A. L. Rowman & Son, General Contractors, Inc. v. HUD,* 611 F.2d 997, 1000 (5th Cir. 1980); *Beale v. Blount,* 461 F.2d 1133, 1138 (5th Cir. 1972); *Doe v. Civiletti,* 635 F.2d 88, 94 (2d Cir. 1980). The Constitution does not waive the Government's sovereign immunity in a suit for damages. *See Jaffee v. United States,* 592 F.2d 712, 715–18 (3d Cir.), *cert. denied,* 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979).

An immunity waiver, if it exists at all, must be found in the statute giving rise to the cause of action. Title V on which plaintiff relies does not suggest that Congress meant to waive the Government's immunity from suit. It does not imply, much less "unequivocally express," that the statute was intended to expand the Government's amenability to suit. H.Rep.No.91–1549, 91st Cong., 2d Sess. *reprinted in* [1970] U.S.Code Cong. & Ad.News 4007, 4024; S.Rep.No.91–617, 91st Cong., 1st Sess. 59–60 (1969).

This suit for damages against the United States based on the Constitution is not contemplated by *Bivens* and its progeny. The United States is immune from suit.

For the foregoing reasons, the district court's dismissal of plaintiff's complaint is affirmed.

AFFIRMED.