**Ronald SIMMAT**

v.

**John R. MANSON, et al.**

**Civ. No. H–82–201.**

United States District Court,
D. Connecticut.

Jan. 24, 1983.

Dominic J. Squatrito, Richard W. Dyer, Manchester, Conn., for plaintiff.

Cornelius Tuohy, Asst. Atty. Gen., Hartford, Conn., for defendants.

## MEMORANDUM OF DECISION

BLUMENFELD, Senior District Judge.

In this action Ronald Simmat, a state prisoner incarcerated in the Connecticut Correctional Institution in Somers, Connecticut (CCI-Somers), seeks a permanent injunction restraining the defendants, John R. Manson, Commissioner of the Department of Corrections for the State of Connecticut, and Carl Robinson, Warden at CCI-Somers, from transferring Simmat out of CCI-Somers. The plaintiff asserts that the defendants' attempt to transfer him out

of state is motivated by their desire to silence his public criticism of them and their administration of the prison. After a hearing on plaintiff's motion for a preliminary injunction the court temporarily enjoined the defendants from transferring Simmat pending an opportunity for a full hearing on the merits of Simmat's first amendment claim. A trial was held before this court from June 15, 1982 through June 22, 1982. The parties have submitted memoranda and proposed findings of fact.

## I. SUMMARY OF FACTS

Ronald Simmat is presently serving a life term for the crime of second degree murder at CCI-Somers, a maximum security prison. In addition to this life sentence, the plaintiff has yet to serve a consecutive sentence of two to five years for the crime of escape. CCI-Somers is Connecticut's only adult male maximum security prison. It currently houses approximately 1350 inmates, a large percentage of whom are hard-core, long-term offenders who have been convicted of crimes of violence. At the time this action was brought Simmat was confined in administrative segregation status in F-block, the most secure unit at CCI-Somers in terms of staff to inmate ratio. It also is the cell block used for punitive segregation, and therefore houses some of the more violent and troublesome prisoners.

Simmat has been an active and articulate critic of the prison administration at CCI-Somers for a number of years. In December of 1979 he began a voluminous correspondence with the Commission on Accreditation for Corrections and numerous public officials documenting in detail his opinion that conditions at CCI-Somers precluded the accreditation of the prison under the standards established by the Commission for adult correctional institutions. He has also written many letters to local newspapers. In April of 1981 he began writing for the *Journal Inquirer,* a newspaper with a circulation in northeast Connecticut encompassing the town of Enfield and Somers. He has written numerous columns which are published under his byline on the editorial page and has, on occasion, provided the paper with information which has been incorporated into news stories. His primary function, however, has been to serve as a columnist rather than a news reporter. The newspaper has provided him with approximately $20 per month to cover his expenses.

Simmat's columns have been consistently critical of the prison administration at CCI-Somers and have provided prisoners with a forum for expressing their complaints against the prison administration and the legal system. Some of his columns have personally attacked the Warden at CCI-Somers, Carl Robinson. His articles have covered, among other things, the following issues: the waste of taxpayers' money caused by inefficient prison administration; Commissioner Manson's cynicism regarding prisoner rehabilitation; the disproportionate number of blacks jailed in Connecticut; discrimination against prisoners who are social activists and/or minorities; the mistreatment of disturbed prisoners; the failure of guards to protect peaceful prisoners during a riot; the abusiveness of many prison guards; the responsibility of the prison administration for riots which have occurred in the past and the likelihood of a major prison-wide riot occurring in the future because of the prison administration's ineffectiveness; the danger to inmates housed in protective custody in E-block because of the prison administration's use of a "snitch system"; the sham of the accreditation process; the administration's retaliation against prisoners, including Simmat himself, for expressing themselves in letters to newspapers and through Simmat's column; and Warden Robinson's alleged withholding of evidence about a murder which occurred at the prison in 1977. Although most of Simmat's articles are overwhelmingly critical of the prison administration, he has occasionally praised certain aspects of the system. One column named a number of guards who perform their jobs fairly and humanely. He has blamed his fellow prisoners for some of the problems at CCI-Somers. For example, one column described how weak prisoners are abused by other prisoners, and in another he encouraged his fellow inmates to express their grievances

through peaceful channels rather than through violence.

This litigation is the result of an attempt by the prison administration to involuntarily transfer Simmat from CCI-Somers to a prison out of state. In Simmat's view the reason he is being transferred is to silence his outspoken public criticism of the prison administration. The defendants maintain that they seek this transfer in order to protect Simmat from physical attack by other prisoners. They argue that, in addition to evidence of specific threats made against Simmat in recent months, his entire history at CCI-Somers supports their judgment that Simmat is an inmate who is likely to be the object of violent physical attacks from other prisoners. In considering this case it is necessary first to review at length the evidence presented by the parties as to the reasons for the defendants' decision to seek Simmat's transfer, and then to apply legal standards to the facts.

## II. REVIEW OF THE EVIDENCE

A. *Defendants' Practice of Transferring Prisoners for Safety Reasons*

The defendants presented evidence demonstrating that it is a relatively common practice for the Department of Corrections to transfer prisoners for reasons of personal safety. During the past five years there have been approximately 111 instances where inmates from CCI-Somers have been transferred out of state to another correctional facility. Of these 111 transfers, 101 were voluntary and 10 were involuntary. Approximately 59 of the voluntary transfers were for protective custody reasons. Of the 10 involuntary transfers, four were primarily for protective custody reasons. Two of these 10 involuntary transfers involved the same inmate.

In addition, during the period from May 1981 until May 1982 there were approximately 122 intra-state administrative transfers from CCI-Somers, 53 of which were deemed for protective custody reasons and five of which were identified as for reasons of both protective custody and probable parole status. Another approximately 89 inmates were transferred from CCI-Somers

to CCI-Cheshire during this period, mostly because of concern for their personal safety due to their youth, appearance, or naivete.

B. *Simmat's Safety and Transfer History*

The defendants' evidence shows that Connecticut correctional officials have been concerned about the plaintiff's personal safety at CCI-Somers since the early 1970's, long before the present controversy arose, and that they have transferred him for safety reasons on several occasions, both within the prison (from general population to administrative segregation in E-block and F-block) and outside the prison to other correctional facilities both within Connecticut and out of state. Some of these transfers have been voluntary, and some involuntary.

In 1971 the plaintiff informed prison officials that another prisoner intended to do him bodily harm and requested a transfer to another facility. His parents wrote letters to the Commissioner of Corrections and the Governor asking for Simmat's transfer. His father, the Reverend Otto Simmat, obtained signatures from members of his congregation in support of a petition to the Warden at CCI-Somers requesting that Simmat be transferred immediately to another facility. The prison authorities placed the plaintiff in protective custody in E-block and, finally, after inquiries from, among others, the Governor, transferred him to CCI-Montville. An out-of-state transfer was offered to Simmat at this time but he declined to accept it. He remained at Montville for approximately one year and then was returned to CCI-Somers. Later the plaintiff was again transferred to Montville for a short time but was sent back to CCI-Somers after he went on a hunger strike and created an incident in the mess hall.

In March of 1975 the plaintiff failed to return to CCI-Somers from a furlough and was charged with the crime of escape. He remained at large until February 15, 1979, when he was returned to Connecticut after being arrested in New Mexico.

On April 7, 1979, shortly after his return to CCI-Somers, Simmat was assaulted by other inmates and sustained serious injuries which caused him to be hospitalized for two weeks for extensive medical treatment, including surgery. Although Simmat said he could not identify his assailants, prison officials believed that the attack may have been the work of a group of inmates who allegedly made it a practice to assault prisoners believed to be informants. When he returned from the hospital Simmat voluntarily placed himself in administrative segregation for protective custody reasons. He also wrote to the state prosecutor asking that a charge of criminal negligence be brought against Warden Robinson because of his alleged negligence in failing to prevent the attack upon Simmat.

On June 13, 1979 the Assistant Warden for Treatment formally requested that Simmat be transferred to a prison out of the state, noting that Simmat had consistently resisted any attempt to transfer him back to general population. On July 19, 1979 the State of New Hampshire agreed to accept the plaintiff pursuant to the New England Corrections Compact. At first Simmat agreed not to resist the transfer, which was scheduled to take place immediately after the disposition of the criminal escape charge which was at that time pending against him in Connecticut Superior Court. After a detailed correspondence between Simmat and various corrections officials, however, the plaintiff changed his mind and resolved to resist any effort to transfer him out of state. He stated at his transfer hearing on July 31, 1980, that he was not yet prepared to return to general population but that he would be ready within the next year. He said that prison officials were "obviously right" in their concern that he might encounter further problems in general population, but that "no prison is a good place to be—I'm a risk anyplace in this place; I stand out—I don't go along with the inmate code. I'm more intellectual than other inmates—it's going to be the same in any prison—I'm paranoid; that will draw heat—I know who my enemies are here—I won't know at New Hampshire." Defendants' Exhibit 28. The Classification Committee concluded that Simmat should be transferred to New Hampshire so that he could make a fresh start in a general population environment.

Immediately upon arriving in New Hampshire Simmat began a course of conduct which, as he admitted to this court, was at least initially calculated to result in his return to Connecticut. Transcript of June 15, 1982 trial at 86. He refused to speak one word to anyone on the prison staff. He remained in maximum custody and refused to shower, wash or change his clothes. He was disciplined for throwing food at prison staff and finally became so withdrawn that, "[h]e can be observed sitting isolated in the furthest corners of his cell with his feet drawn up under him and his arms wrapped over his head." Defendants' Exhibit 33. Finally, on January 30, 1981, the plaintiff was returned to CCI-Somers by New Hampshire prison authorities.

In the fall of 1980 Connecticut corrections authorities began the arrangements necessary to transfer Simmat to the United States Bureau of Prisons. The federal authorities agreed to accept Mr. Simmat on February 4, 1981, designating the Federal Correctional Institution in Petersburg, Virginia, as the specific facility where he would be incarcerated. In the meantime he was placed in administrative segregation upon his return to CCI-Somers because he feared for his safety should he be placed in general population. At that time, however, prison authorities believed that general population was a viable option for Simmat because the leader of the group of inmates believed responsible for the earlier attack upon Simmat had been transferred out of CCI-Somers. Simmat was given the choice of either going back into general population or being transferred to a federal facility. He agreed to go into general population and on March 18, 1981 was transferred from the segregation unit to general population status in B-block.

In April of 1981 Simmat began writing his column for the *Journal Inquirer*. Although many of his articles have been crit-

ical of the prison administration, both the plaintiff and his editor, Chris Powell, believed at the outset that the column might increase the danger to Simmat's personal safety at CCI-Somers. He has attempted to obtain releases from the prisoners about whom he writes and has done so on most occasions. Simmat now believes that the existence of his column has put him in a safer position because even the toughest prisoners view his column as a forum for expressing their concerns about the prison to the public. The prison administration, however, is convinced that the contents of many of his columns have angered numerous prisoners at CCI-Somers and thus exposed Simmat to increasingly grave danger of physical attack.

The Commissioner of Corrections, John Manson, testified that even before making the decision to attempt a transfer Warden Robinson spoke to him several times to recommend that Simmat be transferred out of state for personal safety reasons. The Commissioner, however, asked him to wait "in the hope that Mr. Simmat would ... use better judgment rather than antagonizing the people that he had been antagonizing at Somers." Transcript of trial, June 18, 1982, vol. 4 at 58. Finally, after an incident which occurred in the prison mess hall on November 30, 1981,[1] the Commissioner approved the Warden's request and suggested that an attempt be made to work out a transfer to the State of Florida because Simmat's father was a resident there. Florida, however, was unable to take Simmat and the federal Bureau of Prisons confirmed that Simmat was still acceptable as a candidate for transfer to the federal prison system although he would be sent to the Federal Correctional Institution in Oxford,

Wisconsin, rather than the previously indicated facility in Virginia.[2] Shortly after receiving this communication from the federal officials, defendants held an involuntary transfer hearing at which Simmat was present. The Classification Committee decided to approve the transfer on the basis of evidence concerning a number of incidents which supported the Warden's conclusion that Simmat's safety was in danger at CCI-Somers. Subsequently both the Warden and the Commissioner approved the recommendation of the Committee to transfer Simmat because of concerns for Simmat's safety at CCI-Somers. The transfer has not yet occurred, because this court's preliminary injunction has blocked it.

### C. Simmat's Current Safety Status

The defendants presented quite substantial evidence that Simmat's transfer out of CCI-Somers is essential to protect his personal safety. They rely on a number of specific incidents since the fall of 1981 which have confirmed and strengthened their belief that Simmat must be transferred.

The first incident was brought to Warden Robinson's attention by a letter from Chris Powell, Simmat's editor at the Journal Inquirer, dated November 17, 1981. Powell informed the Warden that Simmat had been threatened by another inmate, Domingo Gonzales, who did not like the fact that Simmat had mentioned his name in one of his columns. Simmat testified that he subsequently resolved his differences with Gonzales and that, at any rate, Gonzales has been transferred out of CCI-Somers. The prison officials, however, view this incident as an example of the kind of antagonism

---

1. The serving line had been held up three or four times because of a shortage of food. According to the disciplinary report filed by correctional officer James Shaw, Simmat walked up to him and hollered, "Mr. Shaw what the [F...] is going on? You people are begging for a riot." Defendants' Exhibit 37. Simmat then turned to face the inmates who were still eating and yelled, "You people are going to get a riot." *Id.* There were approximately 200 inmates in the mess hall at the time and about six guards. Immediately after this incident another prisoner came up to Officer Shaw and asked, "Are

you going to do something about this incident, or are you going to let it go?" Officer Shaw testified that this was said in a manner which he interpreted as expressing hostility towards Simmat. Transcript of trial, June 17, 1982, vol. 3 at 159–60.

2. Although the Federal Correctional Institution at Oxford, Wisconsin is no longer willing to accept Simmat, the defendants intend to transfer him out of CCI-Somers as soon as possible unless they are prevented from doing so by this court.

which Simmat's writing has engendered among his fellow inmates.

On November 19, 1981 Simmat published an article which, in defendants' opinion, has generated a serious and continuing threat to his safety. The article alleged that Warden Robinson failed to pass on information received from an inmate informer about a murder which occurred at CCI-Somers in 1977. In this article Simmat identified the alleged inmate informer as well as the alleged killers, all of whom had been prisoners at CCI-Somers. Warden Robinson was upset by this article both because it contained untruths about himself and, more importantly, because it specifically named the three prisoners and thus invited retaliation against Simmat. Although none of these three individuals are presently incarcerated at CCI-Somers, all three have friends in the prison, and even the plaintiff admits that it is appropriate to worry about an inmate's friends retaliating on his behalf.

A short time after this article appeared in print, an inmate came to see the Warden to tell him that he was angry that he had been referred to in Simmat's column and that he wanted to know what he "could do to stop that." Transcript of March 1, 1982 hearing on plaintiff's motion for a preliminary injunction at 101. The Warden viewed this inmate's complaint very seriously because this prisoner had rarely requested to see the Warden in the past. During the trial this inmate was deposed by plaintiff's counsel and stated that, although he did not appreciate the timing of Simmat's article, he felt no animosity towards the plaintiff.[3] He did admit, however, that he is a good friend of Gary Alexander and communicates with him regularly. Gary Alexander is the prisoner who has been identified by prison authorities as the leader of the group of inmates whom the prison authorities believe to have assaulted the plaintiff in 1979.

Another incident which the defendants view with alarm occurred on November 30, 1981 when the plaintiff created a disturbance in the prison mess hall during the service of the evening meal.[4] Plaintiff received a disciplinary report and was transferred to punitive segregation in F-block.

On December 12, 1981 an article written by Simmat appeared in the *Journal Inquirer.* Prison officials view the article as racist and believe that it has caused antagonism toward Simmat on the part of black and Puerto Rican prisoners. The article was entitled, "Next disturbance may come in prison meal hall." It described conditions which the author viewed as likely to cause a riot in the mess hall. Among other things, Simmat wrote:

> Remember that many of the prisoners serving food are in prison for antisocial behavior, and when they are completely uncontrolled they will go to extremes.
>
> . . . .
>
> Unfortunately the kitchen is used by the prison classification department as a dumping ground for prisoners who don't fit elsewhere, or who have behavior problems that make them unfit for working with machines in the industrial area of the prison. Also unfortunately the classification department has seen fit to assign only black and Puerto Rican prisoners to food service, so no whites are serving food. . . .
>
> To add to the racial difficulties, the black prisoners serving food use racial insults routinely, as do the Puerto Rican prisoners who help serve food.
>
> . . . .

3. A number of prisoners were deposed by the plaintiff in an attempt to show (1) that various prisoners whom the defendants contend represent a threat to Simmat bear him no ill will and have no intention of harming him, and (2) that Simmat's writings generally have not placed him in any danger at CCI-Somers. The court is not inclined to give much weight to statements by prisoners to the effect that they feel no malice towards the plaintiff and do not intend to assault him. These statements were made in response to questions put to them by counsel in the presence of an assistant attorney general of the State of Connecticut. The inmates knew that what they said would be entered in evidence in Simmat's pending trial in federal court. They all apparently hope that Simmat prevails in this litigation. The fact that they clearly are biased leads me to discredit their self-serving testimony.

4. *See supra* note 1.

... I am suggesting that the situation be used to re-socialize the prisoners serving food. Perhaps the correct term is "socialize," since many of these men never learned acceptable social behavior, though most are willing and able to learn it. These men can be trained to be reasonable and conscientious and to have pride in an ability both to prepare and serve good food.

Defendants' Exhibit 44. In the opinion of Warden Robinson and Commissioner Manson this article was seen by the inmates who work in the kitchen at CCI-Somers as a racial slur. The Director of Food Service, who is in complete charge of the mess hall and its personnel and who himself is a black man, testified that some of the prisoners who work in the kitchen expressed anger towards Simmat because of this article and that, in his opinion, Simmat would not be safe in the mess hall.

Another incident, which the defendants rely upon to show the potential for dangerous repercussions resulting from Simmat's involvement with the newspaper, concerned a misunderstanding which resulted in the publication of confidential information given to Simmat by one of his fellow inmates, Lawrence Pelletier. Pelletier at the time was on trial for three counts of felony murder in the Waterbury Superior Court and had given certain information to Simmat, some of which was for public consumption and some of which was to be kept confidential. Simmat passed all the information along to the newspaper with instructions as to what was and what was not for publication. By mistake some of the confidential information appeared in print. Pelletier became upset, and Powell, Simmat's editor, wrote Pelletier a letter of apology taking responsibility for the mistake. Powell also wrote a letter to Simmat, which came to the attention of Warden Robinson,[5] in which he described his mistake as inexcusable and stated, "I'll be doubly sorry if it gets you killed." Defendants' Exhibit A. Although Simmat subsequently explained that Powell was mistaken in viewing Pelletier as a threat and that, in

fact, he has a long-standing and very good relationship with Pelletier, the Warden viewed this incident with alarm.

On February 1, 1982 an incident occurred in the small yard used to exercise prisoners confined in F-block, the segregation unit in which the plaintiff was then housed. A fight between several prisoners had to be broken up by the use of rifle fire. Simmat subsequently wrote an article about the fight in which he identified certain prisoners by name, stated that 13 prisoners were charged with rioting and assault, and criticized the Warden for being away at a professional conference at the time of the disturbance. On February 8, 1982, correctional officers in F-block found a broken razor on the floor with the razor blade missing. The razor had been issued to a prisoner assigned to the same recreation group as Simmat. A strip search of every inmate was conducted in an attempt to find the missing razor blade, but the search was unsuccessful. During the course of this search one of the correctional officers, Richard Juzwik, overheard a conversation between two inmates about Simmat. One said that the prisoners in the segregation unit were getting pretty upset about Simmat's article. Officer Juzwik interpreted this statement as being an expression of opposition to any publicity about the February 1, 1982 incident because the inmates involved did not know whether they were going to face criminal charges as a result of the incident.

The prison administration's belief that Simmat is in danger even when housed in F-block, the most secure unit of the prison, is corroborated by Simmat's own behavior when confined to F-block. Although he was confined to the smallest recreation group in the unit in order to provide maximum security, Simmat refused to leave his cell to go to recreation. Since F-block is a segregation unit, recreation was the only opportunity for Simmat to leave his cell except when he went for a shower or met a visitor. Warden Robinson and Commissioner Manson interpret Simmat's refusal to go

---

5. The plaintiff's mail had been placed under    review by the prison authorities.

to recreation as an indication that he is fearful for his safety. The plaintiff says he does not like to go to recreation and that his conduct is not motivated by fear. The defendants' interpretation of his conduct is reasonable, however, in view of an earlier incident on September 7, 1981, when the plaintiff received a disciplinary report because he refused to leave his cell during a fire drill and admitted to correctional officers that the reason he would not leave his cell was because he was afraid of other inmates in the hallway. The plaintiff lost 30 days of good time credits as a result of this incident.

The prison administration also has ample evidence and good reason to believe that Simmat will be in danger should he be moved to E-block, the protective custody unit. Correctional officer James Burke testified that approximately 15 inmates in E-block have told him over the past five or six months that, "Somebody is going to get that guy [Simmat]" or "Somebody ought to get that guy." Transcript of trial, June 17, 1982, vol. 3 at 11–12. These comments were the result of the fear created among the population of E-block by Simmat's articles concerning the imminent possibility of a major prison-wide riot occurring at CCI-Somers. Simmat has written articles describing the riot which occurred at the New Mexico state prison in 1980 and predicting that similar violence will occur at CCI-Somers unless the administration of the prison makes significant changes. Simmat has been especially critical of the administration's use of a "snitch system" which he says increases the chances that violence will be directed towards protective custody inmates because they are viewed by the inmate population as informers. As recently as June 15, 1982 Simmat wrote a column in the *Journal Inquirer* entitled, " 'Snitch game' invites the most brutal vengeance." The column began:

Riot at Somers State Prison appears to be likely within the next few years, and could happen this year. If there is a major riot prisoners are likely to die— specific prisoners. Many specific prisoners are likely to die by brutal torture, and it is known which prisoners, by cellblock, are most likely to die and why these specific prisoners are marked for death.

Cellblock E is the area where prisoners are sure to die if there is a major riot. Rightly or wrongly, prisoners in Cellblock E are perceived by other prisoners as informers, or snitches, and therefore Cellblock E prisoners are hated beyond reason. In the event of a major riot Cellblock E will be the target for all prisoners who participate in the riot. Given the chance, a horde of enraged men bent on death and mutilation will descend on those in Cellblock E.

Defendants' Exhibit 48. After this article appeared in print about 30 prisoners housed in E-block came to Officer Steven Tozier and asked what the prison administration was going to do to protect them. One prisoner stated, "What the hell is this asshole trying to do, kill us all." Transcript of trial, June 22, 1982, vol. 5 at 71.

D. *Simmat's Contentions Evaluated*

Despite the quite substantial evidence above that defendants seek to transfer Simmat in order to protect him, Simmat asserts that defendants instead seek to transfer him in order to silence him. Simmat presents three types of evidence to support this claim, but none of them are persuasive.

(1) The only direct evidence offered by Simmat is his own testimony that four correctional officers told him that the transfer was being sought in order to silence his critical newspaper columns. All four of these individuals specifically denied making such statements under oath before this court and denied that they hold that view of the purpose of the proposed transfer. Transcript of trial, June 17, 1982, vol. 3 at 15–16, 30–31, 35, 44–50. I therefore do not credit the plaintiff's self-serving testimony.

(2) Simmat has shown that he has been a vocal and persistent critic of the prison administration and that many of his published columns are overwhelmingly critical of the defendants and their administration of CCI-Somers. This evidence alone, however, does not prove that defendants seek to transfer him in retaliation for this criticism.

Indeed, if such evidence were sufficient to prove that the transfer is retaliatory, then any plaintiff who engaged in protected conduct designed to provoke defendant would thereby establish that defendant's action was in retaliation for his protected conduct. Such a doctrine would be most unwise. *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 286, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977) (employee "ought not to be able, by engaging in [protected] conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record").

(3) Plaintiff has presented evidence that he is not in great danger. However, the weight of evidence presented by both sides clearly shows that the officials at CCI-Somers had more than sufficient grounds for concluding that the plaintiff's personal safety at CCI-Somers has been put in jeopardy both by the contents of many of his articles and by his behavior since he became a published newspaper columnist. Simmat's history includes a serious assault by other inmates in the past as well as a number of transfers for personal security reasons before he ever became a published writer. His own behavior demonstrates that he fears for his safety. He has refused to leave his cell in F-block to go recreation and refused to participate in a fire drill because he thought the authorities had taken inadequate security precautions, even though he knew he was subject to punishment as a result of his refusal to leave his cell for the fire drill.

Further, his published columns in the *Journal Inquirer* have been generally inflammatory. Although most of his criticism is directed towards the prison administration, the content of many of his articles may very well engender hostility among the inmate population at CCI-Somers as well as the prison administration. The subtly sarcastic tone of his articles can easily be misunderstood by a prison population that is generally less clever and literate than Simmat himself. He has mentioned specific inmates by name, sometimes without permission, *e.g.,* Plaintiff's Exhibit 6–RR, and has angered many by distorting facts to serve his own purposes. The plaintiff has used his column in the *Journal Inquirer* to bring attention and prestige to himself, sometimes at the expense of other prisoners as well as the prison administration.

### E. *Conclusion*

Although it is possible that the defendants may feel some personal hostility towards Simmat because of his biting criticism of their policies and administration of CCI-Somers, there is ample evidence to support their contention that they seek to transfer Simmat because Simmat's writing and behavior, by engendering hostility among many segments of the inmate population, has put Simmat's safety at substantial risk. I find, therefore, that the reason for the proposed transfer of Simmat is to protect his personal safety and that whatever effect the transfer may have on Simmat's column in the *Journal Inquirer* is caused by defendants' concern for Simmat's safety and the security of the institution and not by their desire to stop Simmat's exposés of their alleged wrongdoing.

### III. LEGAL ANALYSIS

### A. *Determining Whether Defendants' Actions Burdened Plaintiff's First Amendment Rights*

A convicted prisoner retains many constitutional rights, including "those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). Although no due process issues are implicated by the prison authorities' decision to transfer Simmat,[6] *Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976); *Cofone v. Manson,* 594 F.2d 934, 938–39 (2d Cir.1979), a transfer motivated solely by the desire to punish or silence the plaintiff because he

---

**6.** It was noted in this court's Ruling on Plaintiff's Motion for a Preliminary Injunction issued on March 25, 1982, that the plaintiff does not challenge the due process sufficiency of his transfer hearing before the Classification Committee. Ruling at 3 n. 2.

has exercised his first amendment rights is constitutionally deficient.[7]  *Montanye v. Haymes,* 427 U.S. at 244, 96 S.Ct. at 2548 (Stevens, J., dissenting) (allegation that transfer of prisoner made in retribution for his exercise of protected rights sufficient to require trial on remand); *Milhouse v. Carlson,* 652 F.2d 371, 373–74 (3d Cir.1981); *McDonald v. Hall,* 610 F.2d 16, 18 (1st Cir. 1979); *Garland v. Polley,* 594 F.2d 1220, 1223 (8th Cir.1979); *Buise v. Hudkins,* 584 F.2d 223, 229, 232 (7th Cir.1978), *cert. denied,* 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979); *Haymes v. Montanye,* 547 F.2d 188, 190–91 (2d Cir.1976), *cert. denied,* 431 U.S. 967, 97 S.Ct. 2925, 53 L.Ed.2d 1053 (1977); *Fajeriak v. McGinnis,* 493 F.2d 468, 470 (9th Cir.1974); *Abdul Majid v. Henderson,* 533 F.Supp. 1257, 1270 (N.D.N.Y.1982); *Laaman v. Perrin,* 435 F.Supp. 319, 328 (D.N.H.1977).

The plaintiff argues that, although the prison authorities ordinarily have complete discretion in making transfer decisions, the decision to seek his transfer violates his constitutional rights because it is motivated by the desire to silence him and punish him for expressing views critical of the prison administration. This claim must be analyzed under the standards set forth in *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

In *Mt. Healthy,* a teacher was not rehired for a combination of reasons, one of which was that he engaged in certain conduct which was protected by the first amendment. *Id.* at 283 n. 1, 284, 97 S.Ct. at 574 n. 1, 575. The Court held first that, even though the teacher "could have [constitutionally] been discharged for no reason whatever," he could "nonetheless establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of constitutionally protected First

Amendment freedoms." *Id.* at 283–84, 97 S.Ct. at 574. In remanding to the district court for further findings of fact, the Supreme Court held:

> Initially, in this case, the burden was properly placed upon respondent to show that his conduct was constitutionally protected and that this conduct was a *"substantial factor"*—or, to put it in other words, that it was a *"motivating factor"* in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment *even in the absence of the protected conduct.*

*Id.* at 287, 97 S.Ct. at 576 (footnote omitted) (emphasis added). This burden of proof both "sufficiently vindicated" the "constitutional principle at stake" and left employers free to discharge for legitimate reasons. *Id.* at 285–86, 97 S.Ct. at 575. That this was the proper allocation of the burden of proof has recently been reemphasized.

> We held further [in *Mt. Healthy*] that once Doyle had shown "that his conduct was constitutionally protected, *and* that this conduct was a 'substantial factor' ... in the Board's decision not to rehire him," the school board was obliged to show "by a preponderance of the evidence that it would have reached the same decision as to respondent's re-employment *even in the absence of the protected conduct."*

*Board of Education, Island Trees Union Free School District No. 26 v. Pico,* —— U.S. ——, 102 S.Ct. 2799, 2810, 73 L.Ed.2d 435 (1982) (emphasis added) (plurality opinion of four justices; other five justices did not disagree on this point).

---

7. The Supreme Court has left no doubt that a governmental action which penalizes the exercise of constitutionally protected freedoms constitutes impermissible interference with constitutional rights. *E.g., Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972) (even teacher with no expectation of contract renewal could not be denied renewal by state in retaliation for public criticism of administration). The Second Circuit has applied this rule to constitutionally protected rights of prisoners. *Milhouse v. Carlson,* 652 F.2d 371, 374 (2d Cir.1981) (allowing action for damages for officials' retaliation against prisoner's litigation activity).

The First Circuit has applied the *Mt. Healthy* "but for" test to prison transfers. *McDonald v. Hall,* 610 F.2d at 18 (prisoner alleged that attempted transfer was in retaliation for litigation activity).[8]

■ The evidence presented by both parties demonstrates that the defendants seek to transfer Simmat because he has engaged in a pattern of conduct which places him in danger of physical assault at CCI-Somers. The court finds, therefore, that the plaintiff has failed to meet his initial burden under *Mt. Healthy.* While Simmat has shown that his column-writing conduct was constitutionally protected, he has not shown that this conduct was a "substantial factor" or "motivating factor" in the decision to transfer him. It is the consequence of the protected conduct, *i.e.* personal danger to Simmat, as distinguished from the conduct itself, that is the reason for the decision to transfer him.[9] That a significant cause of the perceived danger is the columns which are published under Simmat's byline in the *Journal Inquirer* is not determinative.[10] What is important is that the defendants

quite reasonably believe that the content of the columns and the fact that the inmate population at CCI-Somers knows that Simmat was the author of these articles contributes to a situation that places Simmat in physical danger.[11]

### B. Balancing Plaintiff's First Amendment Rights Against the Defendants' Legitimate Penological Objectives

Because plaintiff has failed to show that his constitutionally protected conduct was a "substantial factor" in the decision to transfer him, it is not necessary for the court to determine whether the defendants have shown that they would have made the same decision even in the absence of the protected conduct. *See Mt. Healthy v. Doyle,* 429 U.S. at 287, 97 S.Ct. at 576. But even if Simmat had prevailed under the "but for" test, he would not necessarily prevail in this action. Whatever the rule may be in other settings, it is already established that the government in operating prisons is subject to less stringent limitations than in the operations of a school system, *e.g., Mt.*

---

**8.** The Second Circuit has applied the *Mt. Healthy* "but for" test to the employee protection provision of the Energy Reorganization Act, 42 U.S.C. § 5851, *Consolidated Edison Co. v. Donovan,* 673 F.2d 61, 62 (2d Cir.1982) (employee claimed discharge motivated by his complaints about safety hazards; employer claimed discharge motivated by employee threatening to kill his supervisor). This circuit has also considered the *Mt. Healthy* "but for" test as perhaps applicable to dual motive discharges in cases arising under section 8(a) of the National Labor Relations Act, 29 U.S.C. §§ 158(a). *NLRB v. American Geri-Care, Inc.,* 697 F.2d 56, 63 (2d Cir.1982); *NLRB v. Charles Batchelder Co.,* 646 F.2d 33, 38–39 (majority), 42 (Newman, J., concurring) (2d Cir.1981).

**9.** Similarly the plurality opinion in *Pico* focused on the *motivation behind the defendant's* conduct. *Pico* concerned removal of books from school libraries by the Board of Education. As in this case, the action may have been motivated by a desire to suppress the exercise of first amendment rights or by legitimate reasons. The Court in *Pico* held:

> Thus whether petitioners' removal of books from their school libraries denied respondents their First Amendment rights depends upon the motivation behind petitioners' actions. If petitioners *intended* by their removal decision to deny respondents access to ideas with which petitioners disagreed, and if

this intent was the decisive factor in petitioners' decision,[22] then petitioners have exercised their discretion in violation of the Constitution.

102 S.Ct. at 2810 (emphasis in original). In footnote 22, the Court explained:

> By "decisive factor" we mean a "substantial factor" in the absence of which the opposite decision would have been reached. See *Mt. Healthy City Board of Ed. v. Doyle,* 429 U.S., at 287, 97 S.Ct., at 576.

The evidence presented by Simmat does not establish that defendants' desire to suppress his first amendment rights was a "substantial factor," let alone a "decisive factor."

**10.** The defendants admit that most of their concern is the direct result of the content of Simmat's articles which inflame the hostility of other inmates towards Simmat.

**11.** The defendants rightly do not attempt to characterize Simmat's writings as "fighting words" not entitled to constitutional protection. *See, e.g., Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). However provocative Simmat's columns may be in the prison environment, they are, in most instances, an attempt to bring to the public's attention matters of serious concern to the society at large and thus are clearly entitled to first amendment protection.

*Healthy v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471; *Board of Education v. Pico,* 102 S.Ct. at 2810. Although a prisoner retains basic first amendment rights "not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system," *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974),

> challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law.

*Id.*

The Supreme Court has upheld even direct restrictions on first amendment speech and associational rights of prisoners where:

> The restrictions imposed are reasonable, and are consistent with the inmates' status as prisoners and with the legitimate operational considerations of the institution.

*Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 130, 97 S.Ct. 2532, 2540, 53 L.Ed.2d 629 (1979) (regulations restricting inmate activity and communication in relation to a prisoners' union upheld as consistent with the first amendment). Similarly, the Second Circuit en banc has acknowledged that "we cannot say with requisite certitude that the traditional and common practice of prisons in imposing many kinds of controls on the correspondence of inmates, lacks support in any rational and constitutionally acceptable concept of a prison system," *Sostre v. McGinnis,* 442 F.2d 178, 199 (2d Cir.1971) (en banc), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972), and has approved prison rules which prevent a prisoner from sharing his law books with other prisoners, *id.* at 202.

Simmat's first amendment interests must therefore be balanced against the legitimate state interests in how the state operates the corrections system. To weigh Simmat's first amendment interests, it should be understood precisely which first amendment interests are at stake in this litigation and which are not. There has been no hindrance of Simmat's right to petition for release from incarceration, to air his grievances within the prison, or to communicate directly with members of the press with respect to the illegality of his incarceration or conditions of his confinement. His first amendment claims are based solely on his status as a newspaper columnist.

Further, the proposed transfer would not directly or absolutely prevent Simmat from writing for publication. Rather, the transfer would deprive Simmat of his job location advantage. Indeed, Simmat himself claims that what the proposed transfer will deprive him of is prestige among prisoners and identification as a columnist for a public newspaper.

The right of the press to gather news in prisons is not absolute, but rather must be balanced against legitimate state concerns. In *Pell v. Procunier,* 417 U.S. 817 at 829–35, 94 S.Ct. at 2807–2810, the Court found that, because the state's prior policy of permitting reporters to interview any inmates whom they identified by name had resulted in publicity which substantially worsened prison discipline, the state was justified in withdrawing the right of reporters to conduct such interviews. Similarly, in the case at bar, the legitimate state concern for Simmat's safety may outweigh the limited incursion on Simmat's first amendment interests.

In evaluating the strength of the state's interest in Simmat's safety, it should be borne in mind that there is a positive constitutional duty on the part of prison officials to protect the personal security and safety of inmates. The Supreme Court has recognized that "the right to personal security constitutes an 'historic liberty interest' protected substantively by the Due Process Clause. *Ingraham v. Wright,* 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977). And that right is not extinguished by lawful confinement, even for penal purposes. *See Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)." *Youngberg v. Romeo,* —— U.S. ——, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982). The Supreme Court's opinion in

*Hutto v. Finney* implied that it is cruel and unusual punishment to hold prisoners in unsafe conditions. Therefore, security and discipline should be paramount concerns of a prison administration; inmates must be protected from violence at the hands of other inmates. *See Engblom v. Carey,* 677 F.2d 957, 970 (2d Cir.1982) (Kaufman, J., dissenting); *Ramos v. Lamm,* 639 F.2d 559, 572 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). Failure of prison officials to do so is actionable by a prisoner, who need not wait until he is actually assaulted to sue. *Woodhous v. Commonwealth of Virginia,* 487 F.2d 889, 890 (4th Cir.1973).

This balancing of Simmat's first amendment rights against the state's legitimate interests has been made in the first instance by the prison administration. In order to review the administration's action, this court must first decide on the standard of review to be applied.

The plaintiff asserts that the exacting standard of judicial review applied by the Supreme Court in *Procunier v. Martinez,* 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974), controls this court's review of the defendants' actions in this case because *Martinez,* like the case at bar, involved prison regulations which burdened the prisoners' freedom of speech. The Court in *Procunier v. Martinez,* 416 U.S. at 415, 94 S.Ct. at 1812, struck down mail censorship regulations which, among other things, proscribed inmate correspondence which "unduly complain[ed] or magnif[ied] grievances." The Court applied a strict standard of review requiring the prison authorities to justify the restrictions (1) as furthering "an important or substantial governmental interest unrelated to the suppression of expression" and (2) as limiting first amendment freedoms "no greater than is necessary or essential to the protection of the particular governmental interest involved." *Id.* at 413, 94 S.Ct. at 1811. The Court explicitly narrowed its holding, however, by stressing that its ruling was based upon the first amendment rights of the inmates' correspondents outside prison and,

therefore, it did not reach the question of "the extent to which an individual's right to free speech survives incarceration." *Id.* at 408, 94 S.Ct. at 1811.

In *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974), the Court directly addressed the issue it avoided in *Martinez* in the course of upholding a prison regulation prohibiting face-to-face interviews of specific inmates by members of the press. The Court explained:

> The "normal activity" to which a prison is committed—the involuntary confinement and isolation of large numbers of people, some of whom have demonstrated a capacity for violence—necessarily requires that considerable attention be devoted to the maintenance of security. Although they would not permit prison officials to prohibit all expression or communication by prison inmates, security considerations are sufficiently paramount in the administration of the prison to justify the imposition of some restrictions on the entry of outsiders into the prison for face-to-face contact with inmates.

*Id.* at 826–27, 94 S.Ct. at 2806. The Court went on to hold that considerable deference should be given to the expertise of prison officials in such matters:

> Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.

*Id.* at 827, 94 S.Ct. at 2806. The standard set forth in *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495, controls any further review of the defendants' actions in the case at bar. Not only is *Pell v. Procunier* more closely analogous to the facts of this case than is *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224, but, in addition, *Pell* is a later and fuller exploration by the Court into the problem of reconciling the first amendment rights of prisoners with the state's legitimate security considerations.[12]

**12.** *See also Youngberg v. Romeo,* —— U.S. ——, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). In

It is clear that under *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495, the defendants have sufficiently justified their decision to transfer Simmat out of CCI-Somers. Various prison officials testified that they view Simmat's transfer as essential if they are to protect his personal safety. Their evidence also convinced the court that Simmat's writings have inflamed an already volatile prison environment and could precipitate a major prison-wide disturbance. Although the defendants do not rely on this latter ground, and although I realize that a riot is always a distinct possibility even without the presence of a prisoner who acts as Simmat does, the evidence presented to the court in this case confirms the wisdom of the Supreme Court's holding that considerable deference must be accorded the judgment of prison officials in matters concerning prison security, *see id.* at 827, 94 S.Ct. at 2806. In view of the fact that the plaintiff has not produced substantial evidence to indicate that the defendants have exaggerated their response to Simmat's situation,[13] *id.,* I must conclude that the security concerns motivating Simmat's transfer would justify whatever burden it may place on his first amendment rights.

## IV. CONCLUSION

Simmat's claim fails on two independent grounds. First, he has failed to establish that his conduct was a "motivating factor" under *Mt. Healthy* in defendants' decision to transfer him. Second, defendants' burdening of Simmat's first amendment rights is justified under a balancing test. Accord-

ingly, I hereby order that judgment in this action enter in favor of the defendants and that the preliminary injunction entered by this court on March 25, 1982 be vacated.

SO ORDERED.

---

*Youngberg,* the Court reviewed a case involving "the proper balance between the legitimate interests of the State and the rights of the involuntarily committed to reasonable conditions of safety and freedom from unreasonable [physical] restraints." The Court held that " 'the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made.' " *Id.,* 102 S.Ct. at 2461 (quoting Chief Judge Seitz, concurring below, 644 F.2d 147, 178 (1980)). If this standard of review is sufficient to protect the rights of the involuntarily committed, who have committed no crime and may not be punished, it is a fortiori sufficient to

protect the rights of prisoners convicted of crimes. *See id.,* 102 S.Ct. at 2458.

**13.** The plaintiff did present some evidence to support his position that he is not in physical danger and, thus, that the defendants' justification of the transfer as necessary to protect his safety is merely a pretext. He testified that, in his opinion, he is not presently in danger at CCI-Somers. In addition, several other prisoners at CCI-Somers testified, at depositions that were entered into evidence, that, in their view, Simmat is not in serious jeopardy. I give little weight to this evidence, however, *see supra* note 3, and find the defendants' substantial evidence to the contrary convincing.