**C.H., et al., federal witnesses**

v.

**Warden SULLIVAN, et al.**

**T.S., federal witness**

v.

**Edwin MEESE, III, et al.**

**John SMITH**

v.

**Edwin MEESE.**

Civ. Nos. 5–86–237, 5–86–368 and 5–87–79.

United States District Court, D. Minnesota, Fifth Division.

July 25, 1989.

Melvin B. Goldberg, St. Paul, Minn., for plaintiffs.

Jerome G. Arnold and James E. Lackner, Minneapolis, Minn., for defendants.

ROSENBAUM, District Judge.

Plaintiffs are federal prisoners serving their sentences under the federal witness security program (WITSEC). They are incarcerated in the protective custody unit (PCU) of the Federal Correctional Institution in Sandstone, Minnesota (FCI Sandstone). Plaintiffs are in this program because they testified on behalf of the government. In return for their testimony, the government promised to provide for their safety.

Defendants are the Attorney General of the United States [1] and his authorized agents, responsible for administering the witness protection program.[2] These autho-

---

1. Plaintiffs name former United States Attorney General Edwin Meese as a defendant. The Court notes that the present United States Attorney General is Richard Thornburgh. Pursuant to Rule 25(d), Federal Rules of Civil Procedure, plaintiffs' actions are unaffected.

2. Pursuant to the Sentencing Reform Act of 1984, Pub.L. 98–473, Title II, c. II, § 211–39, Oct.

rized agents include Mike Quinlan, Director of the Federal Bureau of Prisons; John Sullivan, Warden of FCI Sandstone; and Robert Shearin, Manager of Unit G. Stipulation of Agreed Upon Facts (hereinafter Stip.), par. 8.

Plaintiffs seek to enjoin defendants from continuing a policy of housing two prisoners in one cell (double celling). They claim double celling is a) a breach of contract, b) a violation of the fifth and eighth amendments, and c) a breach of defendants' duty to provide safety. The parties have made cross motions for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.). Based on the files, records, and proceedings in this matter, and for the reasons given herein, defendants' motion for summary judgment is granted and plaintiffs' motion for summary judgment is denied.

## I. *Background*

As a prefatory matter, the Court recognizes that federal correctional facilities have been overwhelmed by the federal prison population. In July, 1988, there were 43,566 inmates occupying federal prison facilities which were designed to house 27,475 prisoners. Dowd Affidavit, par. 11. While double celling is the gravamen of plaintiffs' cause, defendants claim double celling is necessary to meet inmate space needs and to insure the proper placement of future WITSEC inmates. *Id.* at par. 12.

The Attorney General of the United States has authority over the Bureau of Prisons, pursuant to 28 U.S.C. §§ 501, 503, and 509. The Attorney General has delegated the authority to operate federal correctional facilities to the Bureau of Prisons. 28 C.F.R. § 0.96.

As part of their responsibilities, the Attorney General and the Bureau of Prisons oversee the WITSEC program. WITSEC was instituted in 1970. Dowd Affidavit, par. 2. The program provides for the protection and safety of witnesses who have provided assistance to the government in criminal proceedings. The relocation and protection of the witnesses is governed by

12, 1984, prisoners are now entrusted to the

18 U.S.C. § 3521 (relevant portions of which are appended to this opinion).

Title 18, United States Code, Section 3521(d), makes clear that a participant in the WITSEC program must enter into a statutory "memorandum of understanding" with the Attorney General. 18 U.S.C. § 3521(d)(1). This memorandum sets forth the agreements and obligations of both sides. Each such memorandum of understanding reflects the fundamental agreement that the witness will offer testimony in return for protection and safety.

A potential WITSEC witness is screened by the Bureau of Prisons and Department of Justice before admission to the program. If the witness is expected to be incarcerated, the Bureau of Prisons is notified and polygraph testing and pre-commitment reviews are performed. Upon completion of these examinations, a witness finally may be considered for placement. Dowd Affidavit, par. 10.

WITSEC inmates are housed in either general federal or state prison populations, or in one of four federal PCU's. *Id.* at par. 4. An inmate is housed in a PCU if the Bureau of Prisons determines he needs significant protection. *Id.* A PCU is a separate, self-sufficient prison section designed specifically to house WITSEC prisoners. Shearin Affidavit, par. 2.

As of July, 1988, the date of the affidavits filed in this cause, there were a total of 388 WITSEC inmates in federal prisons. Of these, 181 were housed in general federal and state prison populations. Dowd Affidavit, pars. 7 and 8. Four PCU's housed 201 WITSEC inmates. *Id.*

The PCU at FCI Sandstone is Unit G. Unit G has 73 cells, including four segregation cells and seven special management cells. The 62 regular cells range in size from 66 to 84 square feet. Each cell contains a bed, storage area, television, toilet, and sink. Stip., par. 5.

The practice of double celling WITSEC prisoners at FCI Sandstone began in August, 1986. Shearin Affidavit, par. 4.

Bureau of Prisons.

Twelve of the 62 cells are double cells. *Id.;* Dowd Affidavit, pars. 9 and 11. Two of the double cells are 84 square feet, two are 77 square feet, and eight are between 66 and 69 square feet. Stip., par. 6. Segregation and special management cells are not used for double celling. As of July, 1988, four beds were available in the four PCU's for new WITSEC inmates. At that time, 41 persons were potential participants. Dowd Affidavit, par. 11. WITSEC inmates in all four PCU's have been double celled to create space for incoming prisoners.[3] *Id.*

The Bureau of Prisons' primary criterion for selecting candidates for WITSEC double celling is program seniority. A prisoner with greater seniority normally is given a single cell. If a prisoner violates a prison regulation, a possible sanction may be loss of seniority and, potentially, a change of housing. 28 C.F.R. § 541.13; Shearin Affidavit, par. 11. The Bureau of Prisons acknowledges that change of housing to a double cell is also used as an incentive to maintain order and discipline in the PCU. *Id.* at par. 12. Regulation violation is determined by a hearing process. 28 C.F.R. § 541.10, *et seq.* A prisoner who has lost seniority will be double celled only if there is a shortage of WITSEC cell space. Shearin Affidavit, par. 11. Prior to double celling any two particular prisoners, however, the Bureau of Prisons investigates the criminal and WITSEC background of each to insure their compatibility. *Id.*

It is clear that a WITSEC inmate may have personal papers and effects which, if discovered, could reveal the inmate's identity. To maintain these items securely, the prison staff provides a secure storage area for all inmates. Each inmate is also provided a storage box and may purchase a combination lock from the Bureau of Prisons.

Prisoners in Unit G are locked in their cells between approximately 11:00 p.m. and 6:00 a.m. Access to and from a cell is controlled by prison staff. The parties stipulate that a guard can reach a Unit G cell in less than two minutes. Stip., par. 9. Two guards are on duty in the PCU during the night. Shearin Supplemental Declaration, par. 2(A).

Plaintiffs claim double celling is physically dangerous to them. They point to two incidents to demonstrate these dangers. First, plaintiffs offer a letter, written to the defendants by an Assistant United States Attorney,[4] expressing the opinion that double celling a particular prisoner might "comprise [the prisoner's] status as a protected witness ... [and] have an adverse effect on [the prisoner's] ... well-being." Plaintiffs' Exhibit D. Second, plaintiffs point to an assault which took place at the Otisville, New York, WITSEC PCU where a double celled inmate was forced to perform sexual acts with his cell mate. Plaintiffs' Exhibit E.

Defendants, to the contrary, contend there have been no violent incidents at the Sandstone PCU which have been related to any prisoner's participation in the program. The PCU unit manager states that only three incidents have occurred in the PCU since Summer, 1986, and that all were minor, unrelated to WITSEC, and involved inmates who were not celled together. The unit manager, in reviewing PCU disciplinary records, actually notes a decrease in incident reports since double celling was commenced. Shearin Affidavit, pars. 8 and 9. Nationally, the Bureau of Prisons contends that no deaths or assaults have occurred against WITSEC prisoners based upon a prisoner's status as a WITSEC participant. Dowd Affidavit, par. 8.

## II. *Analysis*

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P. Summary judgment may be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to its case and

---

**3.** A fifth PCU is to be opened in November, 1989. Dowd Affidavit, par. 6.

**4.** The parties stipulate to the authenticity of this letter, but its author and the district from which it was issued are not part of the record in order to protect the identities of the plaintiffs.

on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–52, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In response to a summary judgment motion, the opposing party must produce concrete facts demonstrating an issue for trial. *Buford v. Tremayne,* 747 F.2d 445, 447 (8th Cir.1984). The party opposing summary judgment "must present affirmative evidence in order to defeat a properly supported motion for summary judgment ... even where the evidence is likely to be within the possession of the [movant], as long as the plaintiff has had a full opportunity to conduct discovery." *Anderson,* 477 U.S. at 257, 106 S.Ct. at 2514.

In their summary judgment motion, plaintiffs ask the Court to exercise its equitable powers and issue a permanent injunction preventing defendants from continuing their double celling policy. The Court necessarily considers that "an injunction must be tailored to remedy specific harm shown." *Rogers v. Scurr,* 676 F.2d 1211, 1214 (8th Cir.1982). A party seeking an injunction must show an absence of an adequate remedy at law. *Northern California Power Agency v. Grace Geothermal Corp.,* 469 U.S. 1306, 1306, 105 S.Ct. 459, 459, 83 L.Ed.2d 388 (1984). A party must also show that a right has been violated and that a cognizable danger—more than a "mere possibility"—exists of a future violation. *Rogers,* 676 F.2d at 1214.

In considering an injunction against prison officials, a court should "abstain from imposing strict standards of conduct ... in the absence of a concrete showing of a valid claim and constitutionally mandated directives for relief. The court[ ] should not get involved unless either a constitu-

tional violation has already occurred or the threat of such a violation is both real and immediate."[5]  *Id.*

### A. Breach of Contract

Plaintiffs first allege a breach of contract claiming the memorandum of understanding constitutes an enforceable promise. They contend double celling is a breach because it is inconsistent with an express guarantee to provide for and maintain their safety. Although plaintiffs' memoranda of understanding are void of explicit promises of single cells, plaintiffs suggest such a promise must be implied.

Defendants' response is twofold. First, they argue that the absence of a specific single cell provision is fatal to plaintiffs' contention and no such promise is implied. Second, they argue that if any explicit but unwritten promises of a single cell have been made by United States Attorneys or investigative agents, those promises are not binding on the Bureau of Prisons.

### 1. Existence of a Contract

█ Memoranda of understanding have been treated as contracts on several occasions. *See e.g. Garcia v. United States,* 666 F.2d 960, 963 (5th Cir.), *cert. denied,* 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 72 (1982); *Kania v. United States,* 227 Ct.Cl. 458, 650 F.2d 264, 268, *cert. denied,* 454 U.S. 895, 102 S.Ct. 393, 70 L.Ed.2d 210 (1981); *Doe v. Civiletti,* 635 F.2d 88, 95 (2d Cir.1980); *Doe v. United States,* 112 F.R.D. 183, 183–85 (S.D.N.Y.1986). It is clear that the memorandum of understanding has many of the features of a contract—most notably the government and witnesses have surrendered options in return for vari-

---

5. For purposes of these motions, the differences between the criteria for issuing a preliminary and permanent injunction are unimportant. Both remedies are equitable. The Eighth Circuit's standard for issuance of a preliminary injunction is set forth in *Dataphase Systems, Inc. v. C.L. Systems, Inc.,* 640 F.2d 109, 113 (8th Cir.1981). Prior to the enunciation of these four factors, this Court used the same criteria in considering a permanent injunction. *Minnesota*

*Public Interest Research Group v. Butz,* 358 F.Supp. 584, 625 (D.Minn.1973), *aff'd on other grounds,* 498 F.2d 1314 (8th Cir.1974).

Logically, a party asking for a permanent injunction on summary judgment would have to demonstrate that it will be victorious on the merits. The crux of the analysis of both plaintiffs' and defendants' motions is whether either side is entitled to judgment as a matter of law.

ous promises.[6]

Defendants do not directly deny the contractual nature of the memorandum, but vigorously deny any promise to provide a single cell for a WITSEC inmate. They urge, further, that any promises made to that effect are unenforceable, having been made without the authority of the Attorney General or the Bureau of Prisons. The Court holds, for purposes of this motion, that the memorandum of understanding may be treated as a contract between the parties.

### 2. Jurisdiction

Having determined the contractual nature of the memorandum of understanding, the Court must determine, as a preliminary matter, whether it may adjudicate a claim premised on a breach of such a contract. It is well settled that a suit against a federal agency or officer is, in most instances, a suit against the United States, thereby raising issues of sovereign immunity. The Supreme Court has held that "a suit is against the sovereign if 'the judgment sought would expend itself on the public treasury,' or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.' " *Dugan v. Rank*, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963) (*quoting Land v. Dollar*, 330 U.S. 731, 738, 67 S.Ct. 1009, 1012, 91 L.Ed. 1209 (1947), and *Larson v. Domestic & Foreign Commerce*

*Corp.*, 337 U.S. 682, 704, 69 S.Ct. 1457, 1468, 93 L.Ed. 1628 (1949)).

■ This suit is against the Attorney General of the United States and the warden of Sandstone prison. Plaintiffs seek to force them to adjust their prison administration techniques. Plaintiffs seek to force the government to act in a particular manner. The Court finds, therefore, that this is a suit against the United States and implicates principles of sovereign immunity.[7]

■ Sovereign immunity bars a claim against a federal official in his or her capacity unless a waiver of immunity is " 'unequivocally expressed.' " *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980) (*quoting United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969)). In their claim of contractual entitlement, plaintiffs seek to proceed under the Tucker Act, 28 U.S.C. § 1346(a)(2). The Tucker Act provides that:

[t]he district courts shall have original jurisdiction, concurrent with the Court of Claims, of: ... [a]ny ... civil action or claim against the United States, not exceeding $10,000 in amount, founded ... upon any express or implied contract with the United States.

28 U.S.C. § 1346(a)(2). The Tucker Act, then, allows contract suits against the United States.[8]

---

**6.** The memorandum of understanding is, in many respects, similar to a plea agreement. In each case the government makes a commitment in exchange for an act undertaken by the defendant. The witness protection memorandum offers the particular promise of security.

Plea agreements are routinely treated as contracts between the government and the defendant. Once the terms of the agreement are accepted by both sides, the prosecution must honor those terms. *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971); *United States v. McClintic*, 570 F.2d 685, 692 (8th Cir.1978). The treatment given plea agreements seems suitable for analyzing memoranda of understanding as well:

Contract principles often provide a useful means by which to analyze the enforceability of plea agreements and ensure the defendant what is reasonably due him in the circumstances. A plea agreement, however, is not

simply a contract between two parties. It necessarily implicates the integrity of the criminal justice system and requires courts to exercise judicial authority in considering an agreement and in accepting and rejecting the plea.

*United States v. McGovern*, 822 F.2d 739, 743 (8th Cir.) (citations omitted), *cert. denied*, 484 U.S. 956, 108 S.Ct. 352, 98 L.Ed.2d 377 (1987); *see also United States v. Coon*, 805 F.2d 822, 825 (8th Cir.1986); *United States v. Robinson*, 774 F.2d 261, 268–69 (8th Cir.1985).

**7.** Plaintiffs tacitly admit the true defendant in this matter is the United States by invoking 28 U.S.C. § 1346 as a jurisdictional vehicle.

**8.** Plaintiffs are constrained to proceed in reliance upon § 1346. Plaintiffs' alternative jurisdictional provisions—28 U.S.C. §§ 1331 and 1361—are unavailing. Section 1331, federal

But the powers vested in district courts pursuant to § 1346 are limited. Under the Tucker Act, the Court's jurisdiction has been confined to actions for money damages and does not include suits for equitable relief. *Lee v. Thornton,* 420 U.S. 139, 140–41, 95 S.Ct. 853, 854, 43 L.Ed.2d 85 (1975); *Richardson v. Morris,* 409 U.S. 464, 466, 93 S.Ct. 629, 630–31, 34 L.Ed.2d 647 (1973). It is clear, however, that in certain limited instances, equitable relief has been granted where that relief is incidental to money judgments against the United States. *Werner v. United States Dept. of Int., Fish & Wildlife,* 581 F.2d 168, 171 (8th Cir.1978).

Plaintiffs at bar seek only injunctive relief—an end to double celling. The relief is solely equitable. The Court, therefore, lacks Tucker Act jurisdiction and may not entertain plaintiffs' § 1346 contract claim further.

### B. Eighth Amendment—Cruel and Unusual Punishment

Plaintiffs' second argument invokes the eighth amendment. They allege that double celling constitutes cruel and unusual punishment. Plaintiffs acknowledge case law contrary to their position, but claim their special status as protected witnesses renders most of these cases inapposite.

#### 1. Ripeness

Prior to consideration of plaintiffs' eighth amendment claim, the Court must once again consider proper jurisdictional boundaries. The Court clearly has jurisdiction pursuant to 28 U.S.C. § 1331 and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). *See Carlson v. Green,* 446 U.S. 14, 17–19, 100 S.Ct. 1468, 1471, 64 L.Ed.2d 15 (1980). At the same time, the Court must determine whether plaintiffs' claims involve a concrete case or controversy which is ripe for final determination. *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 138–39, 95 S.Ct. 335, 355–56, 42 L.Ed.2d 320 (1974).

Ripeness is a matter of timing. *Id.* at 140, 95 S.Ct. at 357. "[I]ts basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). A court should look to whether defendant's alleged actions have had a concrete effect on the plaintiff. *Id.* at 148–49, 87 S.Ct. at 1515. Yet, " '[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough.' " *Regional Rail Reorganization Act Cases,* 419 U.S. at 143, 95 S.Ct. at 358 (*quoting Pennsylvania v. West Virginia,* 262 U.S. 553, 593, 43 S.Ct. 658, 663, 67 L.Ed. 1117 (1923)). A court should also look to the fitness of the issues for judicial analysis and any hardships which might arise from withholding a decision. *Thomas v. Union Carbide Agricultural Products Co.,* 473 U.S. 568, 581, 105 S.Ct. 3325, 3333, 87 L.Ed.2d 409 (1985); *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1507.

As an example, the Ninth Circuit Court of Appeals recently dismissed a prisoner

---

question jurisdiction, is not a waiver of sovereign immunity. *Hagemeier v. Block,* 806 F.2d 197, 202–03 (8th Cir.1986), *cert. denied,* 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987). Section 1361, the Mandamus Act, allows a court to issue a writ of mandamus to compel an officer of the United States to "perform a duty owed to the plaintiff." 28 U.S.C. § 1361. The invocation of § 1361 is a "drastic" step, *Allied Chemical Corp. v. Daiflon, Inc.,* 449 U.S. 33, 34, 101 S.Ct. 188, 190, 66 L.Ed.2d 193 (1980), to be used in "extraordinary" circumstances. *In re Ford Motor Co.,* 751 F.2d 274, 275 (8th Cir.1984). Mandamus may issue against an official of the United States only when the plaintiff has a clear right to relief, the defendant has a clear duty to perform the act in question, and the plaintiff has no adequate alternative remedy. *Borntrager v. Stevas,* 772 F.2d 419, 420 (8th Cir.), *cert. denied,* 474 U.S. 1008, 106 S.Ct. 533, 88 L.Ed.2d 464 (1985). Plaintiffs seek the Court's enunciation of their claimed asserted right. This "right" is not yet an established fact. Nor is the entitlement to a single cell set forth in 28 C.F.R. § 541, any statute, or the constitution. Plaintiffs' own argument contends the duty arises out of the contract. As such, plaintiffs' invocation of § 1361 does not create jurisdiction in this Court to hear the contract claim. *See White v. Administrator of General Services Administration,* 343 F.2d 444, 445–47 (9th Cir.1965).

suit which claimed impending constitutional injury under the eighth amendment and the due process clause of the fifth amendment. *18 Unnamed "John Smith" Prisoners v. Meese,* 871 F.2d 881, 882 (9th Cir.1989). The Ninth Circuit held the suit was not ripe for consideration. *Id.* The prisoners brought their claim after being advised of a double bunking plan, but prior to its imposition. *Id.* The Ninth Circuit held that the prisoner's action challenging the constitutionality of the proposed WITSEC double bunking plan was premature. *Id.*

On the contrary, Minnesota's double celling plan has been in effect since 1986. Under these circumstances, the Ninth Circuit's holding in *18 Unnamed Prisoners* is not controlling authority. Here, both sides agree, and the Court finds, the matter is ready for final resolution. The issue is purely legal, and needs no further factual development. *Thomas,* 473 U.S. at 581, 105 S.Ct. at 3333. A judicial determination at this time will clarify the propriety of defendants' policy. The case is ripe for adjudication.[9]

### 2. Plaintiffs' Argument

Plaintiffs' ultimate argument is that double celling increases the risk that a witness' actual identity will be discovered, resulting in an injury or death—an occurrence completely at odds with the WITSEC program. Plaintiffs point to the likelihood that their trial materials or personal papers will be pilfered revealing their identity. They claim that lock boxes can be easily opened by a bunk mate. They further suggest the prison's alternative—a holding room with locked files—is similarly flawed; it is burdensome and equally unsafe.

Plaintiffs also argue that night lockups are inherently dangerous because the witnesses are locked in a cell together with no hope of rescue for two or more minutes. Plaintiffs further allege that a prisoner may be paired with another who may be particularly dangerous to himself, thereby increasing chances of attack. It is their position that double celling inherently undermines the very security the WITSEC program is designed to provide, and as to them this form of incarceration is cruel and unusual.

Plaintiffs' eighth amendment action is, therefore, one of limited scope. They focus on the erosion of privacy inherent in double celling and the risk to their safety which results from living in close quarters.[10]

### 3. Standards of Review

A prisoner's conditions of confinement are clearly subject to eighth amendment scrutiny. *Martin v. Sargent,* 780 F.2d 1334, 1338 (8th Cir.1985) *(citing Hutto v. Finney,* 437 U.S. 678, 685, 98 S.Ct. 2565, 2570, 57 L.Ed.2d 522 (1978)). When those conditions result in cruel and unusual punishment, federal courts must act to protect prisoners' constitutional rights. *Rhodes v. Chapman,* 452 U.S. 337, 352, 101 S.Ct. 2392, 2402, 69 L.Ed.2d 59 (1981); *Procunier v. Martinez,* 416 U.S. 396, 405–06, 94 S.Ct. 1800, 1807–08, 40 L.Ed.2d 224 (1974). While no simple definition or "static test" of cruel and unusual punishment is available to scrutinize the double celling policy of WITSEC prisoners, *Rhodes,* 452 U.S. at 346, 101 S.Ct. at 2399, *Tyler v. Black,* 865 F.2d 181, 183 (8th Cir.1989), the Eighth Circuit has mandated a policy of "careful judicial scrutiny" of prison conditions. *Tyler,* 865 F.2d at 184.

In general, the eighth amendment prohibits punishments which, although not

---

**9.** The ongoing nature of the double celling policy obviates any question that the issue may be moot. Defendants continue to double cell WITSEC prisoners and plaintiffs remain in custody. *See Tyler v. Black,* 865 F.2d 181, 183 (8th Cir. 1989) (prisoners' claim of cruel and unusual punishment moot because prison officials discontinued use of boxcar doors for prisoner confinement); *Vosburg v. Solem,* 845 F.2d 763, 769–70 (8th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 313, 102 L.Ed.2d 332 (1988).

**10.** Plaintiffs do not raise issues of inadequate clothing, medicine, nutrition, visitation, physical conditions (such as heat, water, or plumbing), sanitation or staffing. *See Rhodes v. Chapman,* 452 U.S. 337, 364, 101 S.Ct. 2392, 2408, 69 L.Ed.2d 59 (1981). Claims regarding medical and first amendment violations were severed from this action by this Court's order of August 5, 1988, which adopted a report and recommendation issued by the Honorable Patrick J. McNulty, United States Magistrate, dated January 8, 1988.

physically barbarous, "involve wanton or unnecessary infliction of pain" and are "grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes*, 452 U.S. at 346–47, 101 S.Ct. at 2399. Given the impossibility of a bright-line definition, the eighth amendment is afforded a "flexible and dynamic" application. *Gregg v. Georgia*, 428 U.S. 153, 171, 96 S.Ct. 2909, 2924, 49 L.Ed.2d 859 (1976) (joint opinion).

■ When considering "conduct that does not purport to be punishment at all [, such conduct] must involve more than ordinary lack of due care for the prisoner's interests or safety." *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986). In fact, "[i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the cruel and unusual punishment clause." *Id.* at 319, 106 S.Ct. at 1084. The Court is permitted to look at the challenged conditions alone or in combination to determine whether an eighth amendment violation has occurred. *Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2389. A particular prison policy may not directly be a violation, but it may lead to conditions which do constitute a punishment without penological purpose. *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). As far as possible, a court should analyze challenged prison conditions objectively. *Rhodes*, 452 U.S. at 346, 101 S.Ct. at 2399; *Peterkin v. Jeffes*, 855 F.2d 1021, 1024 (3d Cir.1988).

■ When focusing on matters of prisoner safety, an eighth amendment violation may be shown if the plaintiff can demonstrate that a pervasive risk of harm exists and that prison officials fail to respond to that risk. *Vosburg v. Solem*, 845 F.2d 763, 765–66 (8th Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 313, 102 L.Ed.2d 332 (1988); *Martin v. White*, 742 F.2d 469, 474 (8th Cir.1984). A pervasive risk of harm, however, may not be proven by pointing to isolated or occasional incidents of attack or violence. *Vosburg*, 845 F.2d at 765–66; *Martin*, 742 F.2d at 474.

Defendants argue, and plaintiffs do not disagree, that double celling, *per se,* is not unconstitutional. The Supreme Court has specifically held that, for a general prison population, double celling is not a violation of the eighth amendment absent deprivation of food, medical care, sanitation, increased violence, or other conditions intolerable for incarceration. *Rhodes*, 452 U.S. at 347–48, 101 S.Ct. at 2400; *see Cody v. Hillard*, 830 F.2d 912, 914 (8th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1078, 99 L.Ed.2d 237 (1988). The Supreme Court has not directly addressed the constitutionality of double celling a WITSEC or specially protected prisoner.

As such, the Court must conduct its own eighth amendment analysis of double celling for WITSEC prisoners. The Court recognizes, as has the government, that WITSEC prisoners are in greater jeopardy than most. Their cooperation has benefitted the government; the government's admission of these plaintiffs to WITSEC acknowledges the increased danger.

### 4. Violence in a Double Cell

■ For general population prisoners, double celling has passed eighth amendment muster. *Rhodes*, 452 U.S. at 347–48, 101 S.Ct. at 2400. And it is clear, but trivial, that a prisoner cannot be attacked by another if he is alone; so to some extent any multiple celling constitutes a demonstrable risk. But both sides acknowledge that no acts of violence have occurred at FCI Sandstone arising out of the WITSEC program. This does not dispose of plaintiffs' claim, but it is evidence concerning WITSEC safety. As above, plaintiffs offer only the single New York incident involving sexual acts with no indication that WITSEC was implicated. In fact, plaintiffs ultimately offer no specific acts of violence as examples of demonstrated risk. There is, then, no direct evidence that WITSEC double celling alone increases the likelihood of violence so as to create cruel and unusual punishment.

### 5. Secrecy

There is, however, an additional concern regarding WITSEC prisoners: anonymity.

The discovery of a prisoner's identity—more dangerous than general double celling—may constitute cruel and unusual punishment.

Common sense suggests that housing two prisoners in one cell increases the likelihood a prisoner's identity will be discovered. Documents within the double cell present serious security concerns. Yet, other than intuitive considerations, plaintiffs fail to demonstrate a substantial increase in the chances of discovery rising to the level of cruel and unusual conditions.

Plaintiffs offer no examples of one prisoner attempting to identify another. The government has admittedly provided locked boxes which may be protected by a combination lock. Each prisoner is responsible for the documents stored in his own box. Plaintiffs stress the potential for forced or coerced entry into the box. There is simply no evidence that the likelihood of a break-in is increased because two inmates occupy one cell. Plaintiffs have presented insufficient evidence to show that the boxes are more likely to be broken into at night.

The government also provides a significant alternative for the storage of personal papers. FCI Sandstone provides a secure room in which prisoners may keep their property. In that respect, the government certainly has not been deliberately indifferent to the plaintiffs' secrecy. While the room may be inconvenient, which has scarcely been demonstrated, it is not unreasonable to expect protectees to expend some minimal care for their own security. The storage room may not be ideal, but viewed objectively the Court finds it reasonable. Absent a factual history of demonstrated security breaches caused by lack of document security, the Court finds the systems provided by FCI Sandstone do not violate the eighth amendment by jeopardizing the safety of WITSEC inmates.

### 6. Infiltration of Program

Plaintiffs also invite the Court to consider the possibility of an outside individual penetrating the WITSEC program, being placed in a double cell, and injuring or killing a WITSEC prisoner. In the absence of any record evidence in this regard, and considering the acknowledged investigation and background work conducted prior to WITSEC admission, the Court must consider this unlikely. The evidence indicates that the method for selecting prisoners to be housed together provides adequate protection from this risk. It is uncontroverted that each prisoner is screened for compatibility with the other. Prisoners not suited for double celling—such as consistently violent individuals—are not housed with other inmates. Plaintiffs offer no alternative selection methodology or even a cogent criticism of the system in effect.

The Court also considers the extensive examination undertaken by the Bureau of Prisons prior to admitting a WITSEC candidate into the program. Each potential participant is thoroughly investigated prior to admission. The Bureau of Prisons analyzes the personal background and the testimony given by each witness. The Bureau of Prisons' procedure for weeding out program participants may not be foolproof, but it is certainly reasonable. WITSEC is not open to any witness. The chance of an individual testifying for the government and then being approved by the Bureau of Prisons merely to gain access to the program to kill another inmate and then being assigned to the proper institution and finally being placed into the intended victim's double cell is most remote.

Given the government's threefold protection—secrecy maintenance, internal review of cell mates, and review of all WITSEC participants—the Court declines to hold that double celling in the WITSEC program so exposes plaintiffs to outside attacks as to constitute an eighth amendment violation.

### 7. Pervasive Risk of Harm

The preceding leads the Court to conclude that the practice of double celling at FCI Sandstone does not subject plaintiffs to a pervasive risk of harm. Violence within a double cell is possible, yet a single incident is not sufficient to prove by itself that a pervasive risk of harm exists. *Martin*, 742 F.2d at 474. The letter from an Assistant United States Attorney is equally unpersuasive. That letter represents only

an opinion. Absent any factual support, it does not appear to be well-founded.

### 8. Deference

Courts have previously adopted a general policy of leaving regulation of correctional facilities to prison officials. *Martinez,* 416 U.S. at 404–05, 94 S.Ct. at 1807; *Cody,* 830 F.2d at 913. This approach recognizes that considerations of prison procedure and security are more properly weighed by the legislature and prison administrators. *Rhodes,* 452 U.S. at 348–49, 101 S.Ct. at 2400; *Martinez,* 416 U.S. at 404–05, 94 S.Ct. at 1807; *Cody,* 830 F.2d at 913. In discharging a court's proper oversight responsibility, a court must not assume that legislatures and prison administrators have been "insensitive to the requirements of the constitution or to the perplexing sociological problems of how best to achieve the goals of the penal function in the criminal justice system." *Rhodes,* 452 U.S. at 352, 101 S.Ct. at 2402. The Supreme Court has noted that:

> Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint.

*Turner v. Safley,* 482 U.S. 78, 84–85, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). In particular, "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators." *Rhodes,* 452 U.S. at 348–49 n. 14, 101 S.Ct. at 2400 n. 14.

WITSEC is equally entitled to this prudent judicial deference. The initial decision as to whether a witness will be protected is entirely within the Attorney General's discretion. *Abbott v. Petrovsky,* 717 F.2d 1191, 1192–93 (8th Cir.1983); *Bergmann v. United States,* 689 F.2d 789, 793 (8th Cir. 1982). A witness is not entitled to protection on demand. *Abbott,* 717 F.2d at 1193;

*Garcia v. United States,* 666 F.2d 960, 962 (5th Cir.), *cert. denied,* 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 72 (1982).

Given these well-reasoned principles, the Court hesitates to interfere with the double celling policies implemented at FCI Sandstone. Congress saw fit to delegate WITSEC decisions to the Attorney General when it promulgated 18 U.S.C. § 3521. Imposing day-to-day housing requirements upon the officials at FCI Sandstone would be an unwarranted imposition upon this congressional determination. Absent a showing sufficient to demonstrate cruel and unusual punishment, the Court refuses to exercise its equitable powers.

### C. Fifth Amendment—Arbitrary and Capricious

Plaintiffs allege the method for selecting double celled prisoners is arbitrary and capricious, thereby violating the fifth amendment. As set forth, above, the Bureau of Prisons initially uses a seniority system to determine which prisoners are entitled to a single cell. Prisoners with the least seniority are double celled. A prisoner may lose his seniority—and with it his single cell—if he violates prison regulations. Plaintiffs contend this practice is not encompassed within 28 C.F.R. § 541 and is outside the Bureau of Prisons' authority. They argue that deprivation of seniority constitutes punishment beyond that prescribed for their crime and unrelated to any penological purpose. As such, they claim it is a violation of their procedural due process rights and is constitutionally impermissible.[11]

### 1. Retention of Constitutional Rights

It is axiomatic that conviction does not cause an inmate to forfeit all of his constitutional rights. *Native American Council of Tribes v. Solem,* 691 F.2d 382, 384 (8th Cir.1982); *Campbell v. Cauthron,* 623 F.2d 503, 504–05 (8th Cir.1980). A prisoner may not automatically or arbitrarily be deprived of life, liberty, or property without due process of law. *Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41

---

**11.** The Court has jurisdiction over this claim pursuant to 28 U.S.C. § 1331.

L.Ed.2d 935 (1974). But, simply because an inmate retains particular constitutional rights does not mean those rights are not subject to restriction or limitation. "Prisoner disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Wolff,* 418 U.S. at 556, 94 S.Ct. at 2975; *see Bell v. Wolfish,* 441 U.S. 520, 546, 99 S.Ct. 1861, 1877–78, 60 L.Ed.2d 447 (1979). There must be accommodation between the institutional needs and objectives of the prison and the provisions of the constitution. *Bell,* 441 U.S. at 546, 99 S.Ct. at 1878. An inmate's due process rights are subject to the restrictions "imposed by the nature of the regime to which they have been lawfully committed." *Wolff,* 418 U.S. at 556, 94 S.Ct. at 2975; *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948).

#### 2. Life, Liberty, or Property

To determine whether the seniority method of double celling prisoners violates some constitutional stricture, the Court must first identify the precise life, liberty, or property interest at stake. If a life, liberty, or property interest is threatened, the Court must analyze whether the deprivation of that interest meets due process standards. *See Vitek v. Jones,* 445 U.S. 480, 489–90, 100 S.Ct. 1254, 1261–62, 63 L.Ed.2d 552 (1980); *Greeholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 12, 99 S.Ct. 2100, 2106, 60 L.Ed.2d 668 (1979); *Wolff,* 418 U.S. at 557, 94 S.Ct. at 2975; *Albers v. Ralston,* 665 F.2d 812, 816 (8th Cir.1981).

Plaintiffs do not specify a particular right in jeopardy. Instead, they assert that the seniority method bears no relationship to the safety and protection of the inmates. Plaintiffs also contend that the seniority system fails to inhibit inmate prison regulation infractions. For the purposes of this motion, the Court accepts plaintiffs' tacitly proffered interest. Plaintiffs' safety interest is guaranteed by the eighth amendment.[12] *See generally Ingraham v. Wright,* 430 U.S. 651, 673–74, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977). Their safety is also implicated in 18 U.S.C. § 3521. As such, this right may not be infringed upon without due process of law.

#### 3. Due Process

The Supreme Court, in *Turner v. Safley,* recently addressed the constitutionality of rules and regulations which may infringe upon an inmate's constitutional rights. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89, 107 S.Ct. at 2261. The Supreme Court specifically delineated four relevant factors for determining whether a regulation is reasonable. First, there must exist a " 'valid, rational connection' " between the regulation and the governmental interest justifying it. *Id.* at 89, 107 S.Ct. at 2262 (*quoting Block v. Rutherford,* 468 U.S. 576, 586, 104 S.Ct. 3227, 3232, 82 L.Ed.2d 438 (1984)). The "logical connection" cannot be "so remote as to render the policy arbitrary or irrational." The governmental objective, moreover, "must be a legitimate and neutral one." *Id.* 482 U.S. at 89–90, 107 S.Ct. at 2261.

The second consideration "is whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* at 90, 107 S.Ct. at 2261. In examining this aspect of a regulation, a court should keep in mind a " 'measure of judicial deference owed to corrections officials ... in gauging the validity of the regulation.' " *Id.* at 90, 107 S.Ct. at 2261 (*quoting Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974)).

A third factor is the effect "accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* at 90, 107 S.Ct. at 2261. If accom-

---

**12.** In Part II of this order, the Court held that double celling WITSEC prisoners does not, *per se,* violate the eighth amendment. Such analysis, however, does not pre-empt their fifth amendment protections. At issue here is the methodology utilized to implement WITSEC double celling.

modating the asserted right will have a "ripple effect" on other inmates or prison staff, a court should again show proper deference "to the informed discretion of corrections officials." *Id.* at 90, 107 S.Ct. at 2291; *see also Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 132–33, 97 S.Ct. 2532, 2541, 53 L.Ed.2d 629 (1977).

The final consideration is the presence or absence of alternatives to the regulation. "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Turner,* 482 U.S. at 90, 107 S.Ct. at 2261. To the contrary, the existence of ready alternatives may indicate that the regulation is an "exaggerated response" to prison concerns. *Id.* at 90, 107 S.Ct. at 2261. Although this "test" does not require "prison officials ... to set up and then shoot down every conceivable alternative method of accommodating" the prisoner, if an inmate can demonstrate "an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91, 107 S.Ct. at 2261. The Court, then, considers WITSEC double celling in light of these four factors.

### a. Relation to Legitimate Purpose

Plaintiffs contend the Bureau of Prisons' method of selecting inmates to be double bunked is constitutionally flawed. They allege the seniority system—and particularly the disciplinary loss of that seniority—is unrelated to their constitutionally guaranteed safety. In particular, they stress the danger posed by placing violent prisoners in proximity to those who are non-violent.

Defendants offer at least two objectives to justify tying the seniority system to double bunking: discipline and relief of overcrowding. Plaintiffs acknowledge that prison officials may punish by changing an inmate's housing pursuant to 28 C.F.R. § 541.13, and officials at FCI Sandstone have utilized this procedure.

Security is a legitimate prison concern. *Block,* 468 U.S. at 585–590, 104 S.Ct. at 3232–34; *Bell,* 441 U.S. at 546–47, 99 S.Ct. at 1878; *Pell,* 417 U.S. at 827, 94 S.Ct. at 2806; *Little v. Norris,* 787 F.2d 1241, 1244 (8th Cir.1986); *Rogers v. Scurr,* 676 F.2d 1211, 1216 (8th Cir.1982). The Court reaffirms that maintenance of prison discipline is a legitimate prison management objective and further finds that loss of seniority, and with it a single cell, is a technique reasonably related to enforcing cell block discipline. Deprivation of seniority, and the consequent loss of a single cell, is a logical method of persuading WITSEC inmates to obey prison rules. While loss of seniority is a punishment, it is neither irrational nor inherently severe. Plaintiffs' desire to maintain a single, versus a double, cell is a strong impetus to obey prison regulations and thereby maintain institutional security.

The seniority method is also a fair procedure for dealing with limited prison space resources. Given that there are fewer WITSEC cells than WITSEC prisoners, some procedure for choosing which prisoners shall be double celled is necessary. The Court finds the seniority system to be an acceptable means of meeting that need.

The Court notes that discipline, order, and relief from overcrowding are "neutral and legitimate" objectives. The seniority system directly serves those objectives and is not exaggerated, *Turner,* 482 U.S. at 91, 107 S.Ct. at 2263, random or useless, *Laaman v. Helgemoe,* 437 F.Supp. 269, 301 (D.N.H.1977), arbitrary, irrational, discriminatory, *Moody v. Daggett,* 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 279 n. 9, 50 L.Ed.2d 236 (1976), nor purposeless. *Canterino v. Wilson,* 546 F.Supp. 174, 209 (W.D.Ky.1982).

### b. Alternatives Open to Plaintiffs

The second *Turner* consideration is of limited application here. Unlike some prisoners' rights, plaintiffs simply have no alternative means to secure their right to safety.[13] Their safety is in the hands of

---

**13.** In *Turner,* the Supreme Court considered an inmate's right to correspond with an inmate or inmates of another correctional facility. The Supreme Court accorded less weight to this sec-

ond aspect of its analysis. *Turner v. Safley,* 482 U.S. 78, 90–92, 107 S.Ct. 2254, 2263, 96 L.Ed.2d 64 (1987). The Court notes that many rights

prison officials. Yet, plaintiffs can play a role in their own protection. First, they can take advantage of the seniority system to earn a single cell. Second, when a prisoner is double celled he can utilize the available procedures to protect his identity and keep his personal effects confidential. *See* Part II. Third, by obeying prison regulations, a prisoner maintains his seniority status and a single cell.

### c. Impact on Prison Administration

When considering the impact of accommodating plaintiffs' claims on other prisoners and prison resources, the Court must consider the "ripple effect" created by a rejection of the seniority process. *Turner,* 482 U.S. at 91, 107 S.Ct. at 2262. Given the limited number of PCU cells, changing the single cell/double cell method of selection may well keep some prisoners from ever having a single cell. This risk is particularly great if some prisoners are determined (by a method plaintiffs do not make crystal clear) to be more suitable for double celling than others. Almost any method other than seniority would seem to condemn certain prisoners to double celling until prison space could allow for all single cells.

Inherent in plaintiffs' argument is the wish that defendants could provide single cells for all WITSEC inmates. Prison space being finite, this would force prison administrators to allocate more general population cells, already in demand, for protection of WITSEC inmates. Or, to the contrary, it may force defendants to either move WITSEC prisoners into the general population or limit WITSEC to fewer witnesses.

These are considerations a court must properly leave to prison officials. Courts are ill-equipped to wrestle with the mechanics of ordering prison housing. Defendants have instituted a rational system of selecting prisoners for double celling. Plaintiffs offer no alternative, nor any evidence that the system is administered unfairly. On the contrary, defendants submit evidence tending to show that the seniority system is a workable and fair method of

retained by an inmate will not be of the type

meeting the difficulties created by limited space.

### d. Alternatives to Seniority System

The preceding leads directly to the Court's fourth area of inquiry: the availability of "ready alternatives" to the seniority system. *Turner,* 482 U.S. at 91–92, 107 S.Ct. at 2262. Plaintiffs have offered no specific alternative methods of selecting prisoners to be double celled. Plaintiffs' only proposal is to provide single cells for all WITSEC participants. The Court cannot find this to be a viable alternative "that fully accommodates the prisoners' rights at a *de minimis* cost to penological interests." *Id.*

Despite plaintiffs' failure to propose an alternative, the Court posits a system whereby WITSEC prisoners might be selected randomly for double celling. This method, however, would harbor two inherent difficulties. First, completely incompatible inmates could be selected to house together. Second, prisoners who are double celled would have no incentive to act in a manner which would improve their chance of attaining a single cell. Another method might allow prisoners to choose whether they wanted a double cell and, if so, with whom they would share it. The prospect that sufficient numbers of inmates would purposefully opt for double cells, however, appears minimal. Plaintiffs' lawsuit is testimony to at least these particular WITSEC inmates' view of double celling.

The Court declines to accept these alternatives as evidence that the system in place is an "exaggerated" response on the part of defendants. *Id.* Alternatives are conceivable, but are no more logical than the system presently in place. To the contrary, each alternative has inherent shortcomings not found in the seniority system.

### 4. Procedural Safeguards

██ In this regard, there are at least two procedural safeguards in the framework of the seniority system which support a conclusion that the system is reasonable. First, the method of considering whether

which may be exercised in a variety of ways.

an inmate will be deprived of seniority is consistent with procedural due process demands. Second, the process of individual review prior to double celling offers protection against incompatible cell mates.

### a. Hearing Process

The hearing process used at FCI Sandstone is set forth in 28 C.F.R. § 541.14–.17. Following a suspected violation of a prison regulation, a member of the prison staff prepares an incident report. 28 C.F.R. § 541.14(a). An investigation of the incident is conducted by prison staff. 28 C.F.R. § 541.14(a)(1). The accused inmate is entitled to a copy of the incident report, and, if charges are filed by the staff, a copy of the charges. 28 C.F.R. §§ 541.-14(a)(2), 541.15(a).

Upon completion of the investigation, the warden delegates to a unit discipline committee (UDC) the responsibility of conducting an initial hearing. 28 C.F.R. § 541.15(b). At that hearing, the prisoner is entitled to be present, to make a statement, and to present documentary evidence. 28 C.F.R. § 541.15(c)(d). If the charges are moderate or low moderate, the UDC may make final decisions regarding guilt and sanctions. 28 C.F.R. § 541.15(f). In any case, the UDC is to keep a record of the proceedings. 28 C.F.R. § 541.15(f).

If the "alleged violation is serious and warrants consideration for other than minor sanctions," the UDC is to refer the case to the discipline hearing officer (DHO). 28 C.F.R. § 541.15(h). The DHO receives all relevant documents from the UDC and the UDC's recommendation for appropriate disposition. *Id.* At a DHO hearing, the inmate receives notice of the charges and is entitled to "the service of a full time staff member to represent the inmate." 28 C.F.R. § 541.15(a), (b). The

inmate may make a statement, present documentary evidence, and call witnesses to testify. 28 C.F.R. § 541.17(c).

The decision rendered by the UDC must be by the greater weight of the evidence. 28 C.F.R. § 541.15(f). After the UDC or DHO informs the inmate of its decision in writing, the inmate is entitled to appeal the decision to the warden or the regional office or the Bureau of Prisons' legal counsel. 28 C.F.R. § 541.19.

The procedures followed by FCI Sandstone well comport with the procedural due process requirements of the fifth amendment. The inmate is apprised of the charges against him and the facts supporting the charges. *Wolff,* 418 U.S. at 564, 94 S.Ct. at 2978–79. He is allowed a reasonable opportunity to call witnesses and present documentary evidence in his defense. *Id.* at 566, 94 S.Ct. at 2979. Although a witness is not guaranteed representation, the Supreme Court has declined to hold that an inmate is invariably entitled to counsel. *Id.* at 569–70, 94 S.Ct. at 2981.

The committee or board deciding the case, moreover, can be an internal body. *Id.* at 570–71, 94 S.Ct. at 2982. Their decision must be in writing and must set out the facts relied upon and the reasons supporting the decision. *Id.* at 564, 94 S.Ct. at 2979.

The hearing provided for double celling cases is adequate to insure fairness and qualifies as a "mutual accommodation between institutional needs and objectives" and the rights of the inmates. *Bell,* 441 U.S. at 546, 99 S.Ct. at 818. The law requires no additional procedures.[14]

Plaintiffs cannot claim that seniority and its loss are not contemplated by 28 C.F.R. § 541. It is directly related to a sanction set forth in Section 541. The seniority system allows defendants to conveniently

---

**14.** The Court's conclusion is supported by the Supreme Court's treatment of claims similar to those of plaintiffs. The Supreme Court has held that, under certain circumstances, a prisoner is not entitled to due process. These involve transfer of prisons, prisoner classification, eligibility for rehabilitory programs, or degrees of confinement. *Meachum v. Fano,* 427 U.S. 215, 224–25, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976); *Moody v. Daggett,* 429 U.S. 78, 88 n. 9,

97 S.Ct. 274, 289 n. 9, 50 L.Ed.2d 236 (1976); *Montayne v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976). The difference between those cases and this is, of course, that the Supreme Court declined to find a protected life, liberty, or property interest. Here, this Court has recognized plaintiffs' right to safety pursuant to the eighth amendment and 18 U.S.C. § 3521.

determine which WITSEC inmates are entitled to single cells. Depriving an inmate of seniority is merely a method of ordering those inmates who are subject to a change of housing. Defendants have determined that the seniority system is a practical method of deciding which prisoners shall be housed alone or together and they have rationally grafted that selection system onto the system of sanctions imposed for a rule infraction.

### b. Prisoner Compatibility

Overlaid upon the hearing process is defendant's investigation into the criminal history and WITSEC background of each prisoner who may be double celled. Incompatible prisoners are not housed together. *See* Part II.

### 5. Deference

With these facts in mind, the Court declines to enter the fray of prison order and discipline. Having determined that the seniority system is rationally related to penological goals and that the procedure for deprivation of seniority satisfies due process, the Court properly defers from further intrusion into prison management. Prison officials should be afforded "a great deal of discretion in running their institutions." *Sanders v. St. Louis County,* 724 F.2d 665, 668 (8th Cir.1983); *Anderson v. Hascall,* 566 F.Supp. 1492, 1497 (D.Minn.), *aff'd,* 763 F.2d 325 (1983). The Supreme Court, in considering the limits of infringement of a prisoner's constitutional rights by a prison procedure, has provided the explanation for a deferential approach:

> Traditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration. [T]his attitude springs from complementary perceptions about the nature of the problems and the efficacy of judicial intervention. Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism.

*Martinez,* 416 U.S. at 404–05, 94 S.Ct. at 1807. This is both law and sound policy.

The Court holds that as a matter of law defendants' seniority method of determining which WITSEC inmates are to be double celled is neither arbitrary nor capricious. It is reasonably related to valid prison objectives. The process for depriving an inmate of seniority, moreover, comports with accepted standards of due process. The Court declines to hold that the system so infringes upon plaintiffs' safety as to constitute a violation of the fifth amendment.

### III.  Duty to Provide Safe Conditions

■■■ Plaintiffs' final argument alleges breach of an affirmative constitutional duty pursuant to the fifth and eighth amendments to provide personal security and safety.[15] Plaintiffs fail to define the scope of the duty, but direct the Court to Supreme Court decisions discussing a prisoner's right to personal security and to *Simmat v. Manson,* 554 F.Supp. 1363 (D.Conn.1983). Plaintiffs argue that a potentially impending injury is sufficient to constitute a breach of this duty. *See 18 Unnamed "John Smith" Prisoners,* 871 F.2d at 882–83.

Defendants clearly have a responsibility to provide for the safety of WITSEC prisoners. This duty is founded on the fifth and eighth amendments, the provisions of 18 U.S.C. § 3521, and the representations made to plaintiffs in the memoranda of

---

**15.** The Court has jurisdiction of this claim pursuant to 28 U.S.C. § 1361. *See* n. 5.

understanding. Yet plaintiffs have wholly failed to demonstrate that defendants' actions have violated this duty.

The Court has held that double celling WITSEC inmates does not constitute cruel and unusual punishment. The Court has upheld the security and secrecy measures implemented at the prison. The Court has also approved the method of selecting which prisoners are to be double celled in the face of a fifth amendment challenge. That method is neither arbitrary nor capricious and is supported by the protection inherent to the process by which WITSEC participants are selected. Given these holdings, the Court finds no basis upon which to declare defendants' actions a breach of their affirmative duty to provide safety.

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED that:

1. Plaintiffs' motion for summary judgment is denied.

2. Defendants' motion for summary judgment is granted.

### APPENDIX

Title 18, United States Code, Section 3521, provides in relevant part:

§ 3521. Witness relocation and protection.

(a) (1) The Attorney General may provide for the relocation and other protection of a witness or a potential witness for the Federal Government or for a State government in an official proceeding concerning an organized criminal activity or other serious offense, if the Attorney General determines that an offense involving a crime of violence directed at the witness ... is likely to be committed.

\* \* \* \* \* \*

(b) (1) In connection with the protection under this chapter of a witness, a potential witness, or an immediate family member or close associate of a witness or potential witness, the Attorney General shall take such action as the Attorney General determines to be necessary to protect the person involved from bodily injury and otherwise to assure the health, safety, and welfare of that person ... for as long as ... the danger to that person exists.

\* \* \* \* \* \*

(c) Before providing protection to any person under this chapter, the Attorney General shall, to the extent practicable, obtain information relating to the suitability of the person for inclusion in the program, including the criminal history, if any, and a psychological evaluation of the person.

\* \* \* \* \* \*

In assessing whether a person should be provided protection under this chapter, the Attorney General shall consider the person's criminal record, alternatives to providing protection under this chapter, the possibility of securing similar testimony from other sources, [and] the need for protecting the person....

\* \* \* \* \* \*

(d) (1) Before providing protection to any person under this chapter, the Attorney General shall enter into a memorandum of understanding with that person. Each such memorandum of understanding shall set forth the responsibilities of that person.... Each such memorandum of understanding shall also set forth the protection which the Attorney General has determined will be provided to the person under this chapter.

\* \* \* \* \* \*

(2) The memorandum of understanding shall be signed by the Attorney General and the person protected.

18 U.S.C. § 3521(a)(1), (b)(1), (c), (d)(1) and (2).